David ZUCKERBRAUN, as Administrator of the Estate of Earl Patton Ryals, Plaintiff–Appellant,

v.

GENERAL DYNAMICS CORPORATION; Raytheon Company; FMC Corporation; Hughes Aircraft Company; Unisys Corporation; RCA Corporation, Government Systems Division, Defendants–Appellees,

and

United States of America, Intervenor.

No. 1405, Docket 91–6002.

United States Court of Appeals, Second Circuit.

Argued May 3, 1991.

Decided June 13, 1991.

Raymond L. Baribeault, Jr., New London, Conn. (Thomas B. Wilson, Suisman, Shapiro, Wool, Brennan & Gray, New London, Conn., of counsel), for plaintiff-appellant.

Mark B. Stern, Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Richard Palmer, U.S. Atty., D. Conn., New Haven, Conn., Barbara L. Herwig, Dept. of Justice, Washington, D.C., of counsel), for intervenor.

Herbert L. Fenster, Washington, D.C. (McKenna & Cuneo, Washington, D.C., of counsel), for defendants-appellees General Dynamics Corp., Hughes Aircraft Co., and Unisys Corp.

Matthew D. Powers, San Francisco, Cal. (Orrick, Herrington & Sutcliffe, San Francisco, Cal., of counsel), for defendant-appellee RCA Corp., Government Systems Div.

Garrett J. Fitzpatrick, New York City (Mendes & Mount, New York City, of counsel), for defendants-appellees Raytheon Co. and FMC Corp.

Before WINTER and WALKER, Circuit Judges, and MUKASEY, District Judge.[*]

WINTER, Circuit Judge:

This appeal arises from a wrongful death action against the manufacturers of a missile defense system that allegedly failed to repel a missile attack upon a United States Navy frigate as a result of the defendants' negligence. We hold that the district court properly dismissed the suit because the government properly invoked the state secrets privilege and thereby prevented appellant from offering evidence sufficient to establish a prima facie case.

## BACKGROUND

During part of the protracted war between Iran and Iraq in the 1980's, the United States maintained a naval presence in the Persian Gulf to protect shipping in those waters. On May 17, 1987, the frigate U.S.S. Stark, an Oliver Hazard Perry class frigate, was patrolling the Gulf when it was struck by two Exocet missiles fired by an Iraqi F–1 Mirage fighter jet. The attack killed thirty-seven crewmen, including Earl Patton Ryals.

On May 16, 1990, David Zuckerbraun, as administrator of Ryals's estate, filed the instant action in the District of Connecticut against General Dynamics Corporation, Raytheon Company, FMC Corporation,

[*] The Hon. Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

Hughes Aircraft Company, Unisys Corporation, and RCA Corporation, Government Systems Division. The complaint alleged that the defendants negligently designed, manufactured, tested, and marketed the weapons systems aboard the U.S.S. Stark, including the Phalanx Anti–Missile System, that were intended to destroy hostile aircraft or missiles approaching the vessel. It is claimed that defendants' negligence rendered the U.S.S. Stark incapable of defending against the Iraqi Exocet attack, thereby causing Ryals's death.

On August 24, 1990, Judge Burns granted a motion by the United States to intervene as a party defendant. Thereafter, H. Lawrence Garrett, III, Secretary of the Navy, formally asserted on behalf of the United States the state secrets privilege with respect to information regarding the specifications of the weapons and defense systems aboard the U.S.S. Stark as well as the procedures governing their use. Secretary Lawrence's Declaration and Claim of the State Secrets Privilege is appended as Appendix A. In that Declaration and Claim, the Secretary stated that the U.S.S. Stark belongs to the most advanced class of frigate in the Navy, which class is expected to be a primary surface combat vessel well into the twenty-first century. Consequently, the Secretary stated, technical data regarding the design, performance, and functional characteristics of the weapons and defense systems of the U.S.S. Stark are classified. Similarly classified are the "rules of engagement" under which the ship's commanders operate when determining whether and when to use these systems. In the Secretary's opinion, disclosure of this information in litigation would cause "grave damage" to the national security of the United States by enabling potential enemies to exploit weaknesses in the pertinent weapons systems and to develop specific countermeasures to those systems.

On September 5, 1990, after Secretary Lawrence's invocation of the privilege, the United States filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6), for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. On September 10, 1990, the corporate defendants followed with a similar motion.

The district court granted the motions and entered judgment in favor of the defendants. See *Zuckerbraun v. General Dynamics Corp.*, 755 F.Supp. 1134 (D.Conn.1990). The court found that the state secrets privilege had been properly invoked as to the weapons systems on the U.S.S. Stark and as to the rules of engagement, thereby denying access to information essential to appellant's establishing a prima facie case. Consequently, the court concluded, dismissal for failure to state a claim was appropriate. See *id.* at 1137–40. Alternatively, the district court found that the suit must be dismissed because it presents a nonjusticiable political question concerning military decision-making. See *id.* at 1140–42.

## DISCUSSION

■■■ The state secrets privilege is a common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security. See *In re United States*, 872 F.2d 472, 474 (D.C.Cir. 1989). In *United States v. Reynolds*, 345 U.S. 1, 7–11, 73 S.Ct. 528, 531–34, 97 L.Ed. 727 (1953), the Supreme Court recognized this privilege and set forth standards governing its use. The privilege may be invoked only by the government and may be asserted even when the government is not a party to the case. See, *e.g., Fitzgerald v. Penthouse Int'l Ltd.*, 776 F.2d 1236 (4th Cir.1985). The privilege must be claimed by the head of the department with control over the matter in question after personal consideration by that officer. See *Reynolds*, 345 U.S. at 7–8, 73 S.Ct. at 531–32. Once properly invoked, the effect of the privilege is to exclude the evidence from the case. See *Ellsberg v. Mitchell*, 709 F.2d 51, 65 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984).

■■■ A court before which the privilege is asserted must assess the validity of the

claim of privilege, satisfying itself that there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security. In making this assessment, however, the court must not "forc[e] a disclosure of the very thing the privilege is designed to protect," *Reynolds*, 345 U.S. at 8, 73 S.Ct. at 532, and, although the privilege is not to be lightly invoked, *see id.* at 7, 73 S.Ct. at 531, the court must accord the " 'utmost deference' " to the executive's determination of the impact of disclosure on military or diplomatic security. *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir.1978) (*Halkin I*) (quoting *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974)). "[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds* 345 U.S. at 11, 73 S.Ct. at 533.

■ In some cases, the effect of an invocation of the privilege may be so drastic as to require dismissal. Thus, if proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a prima facie claim, dismissal is appropriate. *See Halkin v. Helms*, 690 F.2d 977, 998–99 (D.C.Cir.1982) (*Halkin II*); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir.1980) (en banc). Similarly, it has been held that, if the court determines that the privilege so hampers the defendant in establishing a valid defense that the trier is likely to reach an erroneous conclusion, then dismissal is also proper. *See Molerio v. Federal Bureau of Investigation*, 749 F.2d 815, 825 (D.C.Cir. 1984).

■ The precise rule under which dismissal should occur is not entirely clear. Dismissal under Fed.R.Civ.P. 12(b)(6) seems inappropriate because the complaint will typically state a claim for relief under notice pleading rules. Where the effect of the invocation of the privilege is to prevent the plaintiff from establishing a prima facie case, the dismissal is probably most appropriate under Rule 56 on the ground that plaintiff, who bears the burden of proof, lacks sufficient evidence to carry that burden. Where the court determines that the privilege will prevent the defendant from establishing a valid defense, a Rule 56 dismissal may be appropriate on the ground that plaintiff's evidence is legally insufficient on the whole case. *See Molerio*, 749 F.2d at 825. We need not determine the latter issue, however, because the effect of the privilege in the instant matter is to prevent plaintiff from establishing a prima facie case.

■ Appellant cannot seriously contest the fact that the privilege was properly invoked. Paragraphs 6–21 of the Secretary's Declaration provide a lengthy and detailed description of the subject matter of the classified information concerning the weapons and defense systems aboard the U.S.S. Stark and of the rules of engagement governing use of those systems. Paragraphs 22–24 explain that use of this information in litigation would be inimical to the national security. Paragraphs 25–28 invoke the state secrets privilege. As a reviewing court, we conclude that it is self-evident that disclosure of secret data and tactics concerning the weapons systems of the most technically advanced and heavily relied upon of our nation's warships may reasonably be viewed as inimical to national security. The privilege was thus properly invoked.

■ Once the privileged information was removed from this case, dismissal was appropriate. The factual questions concerning the liability of the defendants are: (1) what the Phalanx and other weapons systems aboard the U.S.S. Stark were supposed to do; (2) if the systems were supposed to repel the Iraqi Exocet attack, whether the Stark attempted to use these systems; and (3) if so, whether the systems failed to perform because of the defendants' negligence. These questions cannot be resolved or even put in dispute without access to data regarding the design, manufacture, performance, functional characteristics, and testing of these systems and the rules of engagement under which the Stark was operating. This data is in its entirety classified and subject to the claim of privilege. The very subject matter of this ac-

tion is thus a state secret, *see Reynolds*, 345 U.S. at 11 n. 26, 73 S.Ct. at 533 n. 26 (citing *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875)), and there is no evidence available to the appellant to establish a prima facie case.

 Appellant contends nevertheless that he should be permitted discovery. We disagree. Appellant has not designated any sources of reliable evidence on the factual issues going to liability. Any evidence procured through discovery would of necessity be of no greater reliability than dockside rumor, if that, and clearly insufficient to establish a prima facie case in an area involving highly sophisticated technology and secret military tactics. Discovery would thus be a waste of time and resources. Appellant also urges us to remand the case to the district court for *in camera* proceedings. We see no reason for such a measure. *In camera* review is a method by which a court can confidentially review the evidence for which a privilege is claimed and determine the propriety of the assertion of the privilege. *See, e.g., Kerr v. United States District Court*, 426 U.S. 394, 405, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976). In this case, there is no need for such a review. If the materials for which the privilege is claimed do not concern the matters described in Paragraphs 6–21, then they are irrelevant. If they do concern those matters, then they are privileged. *In camera* review would thus not alter the disposition of the case.

## CONCLUSION

For the reasons stated above, the order of the district court dismissing the complaint and entering judgment for defendants is affirmed.[1]

## APPENDIX A

DECLARATION AND CLAIM OF THE STATE SECRETS PRIVILEGE OF H. LAWRENCE GARRETT, III, SECRETARY OF THE NAVY

I, H. LAWRENCE GARRETT, III, HEREBY DECLARE:

1. I am currently the Secretary of the Navy of the United States of America and the chief executive officer of the Department of the Navy. In this capacity I possess original TOP SECRET classification authority; this means that I am authorized by the President under Executive Order 12356 to determine the proper classification of information through the level of TOP SECRET on behalf of the United States.

2. As Secretary of the Navy, I am responsible for the administration of all activities within the Department of the Navy. The official activities of the Department of the Navy are many and diverse, but all have a single objective—the preservation of national security. In order to best achieve that objective, the Navy employs numerous weapons systems, defensive systems and other technical devices aboard warfighting ships around the world. These systems which are mounted on our ships and other weapons platforms are the foundation of the warfighting apparatus that provides the ultimate safeguard for our national security and means of carrying out our national foreign policy. Such systems were mounted on board the USS STARK in 1987.

3. USS STARK (FFG–31) is an Oliver Hazard Perry (FFG–7) class frigate. This class of ship comprises the United States' most advanced frigate. There are fifty-one (51) Oliver Hazard Perry class frigates commissioned; those frigates are the largest class of surface combatants in the U.S. Navy. Furthermore, USS STARK and sister ships of the class are expected to be the United States' primary class of frigates well into the 21st century.

4. I have been advised of the pendency of the lawsuits filed in the United States District Courts for the Southern District of Texas (*Bareford v. General Dynamics, et al.*) and the District of Connecticut (*Zuckerbraun v. General Dynamics, et al.*) relating to the attack on the USS STARK on 17 May 1987 while that ship was operating

---

1. Because we find that the action was properly dismissed on the basis of the state secrets privilege, we need not address the political question issue.

in the Persian Gulf. I have reviewed the pleadings which contain allegations regarding the inadequate design, manufacture, testing and installation of shipboard weapons and defense systems on the USS STARK. I have concluded that litigation involving these allegations would of necessity require examination of the use and capabilities of these systems as well as the "rules of engagement," the orders the ship commanders operate under in determining whether and when to employ weapons and defensive systems. The Rules of Engagement and many features of the weapons systems relevant to the litigation of these suits are properly classified in accordance with Executive Order 12356, and the disclosure of this information reasonably would be expected to cause measurable damage to the national security of the United States.

5. Attorneys for the United States have reviewed with me the types of information that plaintiffs would require in order to establish legally sufficient claims. I have personally reviewed the classification of those types of information and determine that its disclosure would cause damage to the national security of the United States as further described below.

6. The types of classified information to which plaintiffs would require access to prove their *prima facie* case against the various defendants include:

a. The rules of engagement authorized for, and military operational orders applicable to, USS STARK at the time of the incident; and

b. General technical information regarding the design, performance and functional characteristics of combatant ships and the weapons and defense systems installed thereon, including operational and tactical tests and evaluations, and hardware applications and descriptions.

The classified aspects of several of the pertinent systems are more specifically set forth below.

7. The rules of engagement authorized for, and military operational orders applicable to USS STARK at the time of the incident are classified information. Rules of engagement and operational orders instruct commanders as to the circumstances under which—and the extent to which—they may employ weapons and defensive systems. Rules of engagement are based upon factors which include combat systems doctrine and intelligence estimates. In this case, the STARK's rules of engagement were tailored based upon threat assessments she was expected to face. Rules of engagement are classified in order to prevent potential aggressors from determining the circumstances under which—or the extent to which—U.S. forces will engage them.

8. General technical information regarding the design, performance and functional characteristics of combatant ships, when associated with specific tactical situations, constitutes classified information.

9. Design, performance, and functional characteristics of shipboard radar systems are classified, insofar as they pertain to:

a. Systems accuracy, including range, height, and bearing;

b. Range, including the maximum acquisition and tracking range;

c. The maximum altitude and elevation angle;

d. Radio frequency coverage;

e. Pulse lengths;

f. Antenna characteristics (horizontal and vertical beam with polarization);

g. Resolution (azimuth and range);

h. Waveform;

i. Pulse modulation characteristics and power output;

j. Systems capacity as to target capacity, data rate, or false alarm rate;

k. Design information as to threat recognition time; minimum discernible signal; signal processing; and modulation sensitivity and techniques;

l. Electronic Counter–Measures and Counter–Counter Measures (ECM/ECCM) capability as to:

(1) design and achieved goals;

(2) specification requirements;

(3) circuitry employed to obtain capabilities; and

(4) vulnerability to ECM.

m. Radar system reliability as to data concerning mean time between failures (MTBF) or mean time to repair (MTTR), or the level of reliability achieved by the radar system; and

n. Vulnerability of the radar system to blast, shock and other forms of countermeasures other than electronic countermeasures (ECM).

10. Operational and tactical performance features of shipboard radar systems are classified. (The term "performance" is specifically designed as: radar system accuracy in locating targets; or multiple target discrimination/resolution capability; or detection and probability of false alarm and target cross section are included; or target detection range when both probability of detection and probability of false alarm and target cross sections are included; or antenna gain, sidelobe structure and scan characteristics.)

11. Shipboard radar system hardware is classified whenever disclosure of the hardware itself reveals classified aspects of the system such as those described above.

12. Design, performance, functional characteristics, and tactical or operational test data of the AN/SLQ–32(V)2 Electronic Counter-measure System is classified. The SLQ–32(V) counter-measures set is a 3–variant family of electronic warfare systems for defense of ships against the anti-ship cruise missile threat. The SLQ–32(V)2 provides operational capability for early warning of threat weapon system emitters; threat information to own ship hard-kill weapons; automatic dispensing of chaff centroid decoys; and active electronic counter-measures to alter radio frequency homing missile trajectories to achieve a miss. The following design performance and functional characteristics of this system are classified:

a. Accuracy:

(1) identification; and

(2) direction finding.

b. Control: interface with the Navy Tactical Data System (NTDS).

c. Range:

(1) of intercept; and

(2) target classification versus range capability.

d. Resolution:

(1) electro-magnetic (EM) parameter measurement;

(2) antenna beam patterns;

(3) target resolution/range/bearing;

(4) frequency response; and

(5) narrow bandwidth frequency response.

e. Signature characteristics:

(1) resolving bandwidth;

(2) transmission bandwidth;

(3) receiving sensitivity;

(4) noise figure;

(5) of hostile signals; and

(6) transmitter/jammer.

f. Reliability/Availability:

(1) system reliability mean time between failures (MTBF)/availability.

g. Systems capability:

(1) number of targets;

(2) operational capability with respect to threat environment defined by current ELINT information;

(3) effective radiated power;

(4) duty factor;

(5) response time;

(6) modulation techniques for specific emitters; and

(7) modulation techniques not related to specific emitters.

h. Vulnerability to electronic counter-countermeasures (ECCM).

13. Operational test and evaluation data of the SLQ–32(V)2 revealing deficiencies in the system which have not yet been corrected are classified.

14. The following features of the hardware of the SLQ–32(V)2 are classified:

a. An external view of the hardware of the display console with the system operating and with operational software installed.

b. An external view of the display control console with System Diagnostic Test

(SDT) software or Operator Training Software (OTS) installed.

c. Systems operating (power on):

(1) operational software;

(2) SDT or OTS software installed;

(3) OTS software or source listing;

(4) operational software program package:

(a) threat library source listing;

(b) operational software source listing; and

(c) ECM data base (isolation data) listing.

15. Design, performance, and functional characteristics of the MK–92 Fire Control System are classified insofar as they pertain to the following:

a. Counter-countermeasure capability of the system;

b. Vulnerability of system radar sets to countermeasures;

c. System accuracy;

d. System radar set resolution and target discrimination;

e. Operating frequencies of system radar sets;

f. Pulse coding/spacing of system radar sets;

g. System speed velocity—maximum targets;

h. System capacity—threat configurations to exceed response capability;

i. System vulnerability to blast shock;

j. MK–92 computer tapes MOD 1, MOD 2, and MOD 5, when these tapes are associated with classified WS–8506.

16. Tactics developed for the operational use (military application) of the MK–92 Fire Control System are classified.

17. The operational readiness of the MK–92 Fire Control system is classified.

18. The following aspects of the MK–92 Fire Control Systems hardware are classified:

a. Transmitter, Radar T–1085, when the system assigned frequency determining crystals are installed;

b. Complete crystal sets, when specific operating frequencies are identified and the crystals are installed in the radar transmitter T–1085; and

c. Weapons control consoles (WCC) MK–106 Mods 0 and 1, and MK–107 MOD 1, when the WCC's are operating under the control of the AN/UYK–7 computer.

19. The mission of the Navy's Close–In Weapons System (CIWS), popularly known as the "Phalanx," is to provide—as part of a defense in depth—a fast reaction, terminal defense against low flying, high speed anti-ship missiles penetrating other fleet defense. The system is an automatic, self-contained unit consisting of a search and track radar, digitalized fire control system, and a 20MM M61A1 gun mounted in a single above-deck structure. The following features of the Close–In Weapons System are classified:

a. Threat analysis data and conclusions;

b. Vulnerability of radar;

c. Numerical frequency bandwidth;

d. Specific frequency;

e. Detection/acquisition range;

f. Pulse width and repetition rate;

g. Accuracy and kill probability;

h. Test results which reveal the effectiveness of the weapon;

i. System reaction time;

j. Tactics developed for the operation use of the system;

k. Material deficiency reports addressing performance or technical deficiencies in the system/program;

l. Reports addressing uncorrected deficiencies which reveal degrading or inability of the system/program to function as designed; and

m. Evaluations or assessments of uncorrected material deficiencies, which reveal degrading of the system/program.

20. Chaff is material that is launched from the ship and which forms a radar target as a decoy for a threatening anti-ship missile. USS STARK was equipped with MK–182 chaff rounds. Design, performance, and functional characteristics of the MK–182 chaff rounds are classified insofar as they pertain to:

a. Functional data pertaining to the effectiveness of the decoy against hostile missiles;

b. Chaff frequencies and sizes when associated with the warhead;

c. The specific amount of chaff by frequency or length;

d. Chaff dispersion, range tables and trajectories;

e. Threat analysis data and conclusions;

f. Operational planning data and tactics;

g. Placement envelope requirements;

h. Information concerning the warhead when loaded with the chaff;

i. Information concerning the chaff when associated with the warhead; and

j. Test results.

21. In addition to the classified nature of USS STARK's specific weapons systems, general technical information regarding the ship and her integrated operational capabilities are also classified. For example, the following areas have been classified:

a. Ship general plans and general arrangement drawings; and

b. Combat System Technical Operations Manuals.

22. I have considered carefully the classified aspects of the above described weapons systems and have concluded that these systems enhance considerably the national security of the United States. I have also concluded that public disclosure of the classified information involved in these systems could reasonably be expected to cause grave damage to the national security. Since military application is made of these systems, it is my opinion that disclosures of classified information concerning them in litigation would permit foreign powers to exploit weaknesses and to adopt specific counter-measures. Disclosure of such information would provide potential enemies of the United States with detailed information regarding the capabilities of these weapons systems and the USS STARK, which would aid them in identifying potential areas of military vulnerability which may exist in those systems and in that ship and similar types of ships. Such disclosures would therefore permit potential enemies to develop and employ diversionary or deceptive tactics and counter-measures with increased confidence, and to construct offensive actions with greater confidence in the likely United States' technical response and defense to those actions. The knowledge gained through disclosure of the classified aspects of these systems would greatly assist foreign powers and organizations that are aligned against the United States. These conclusions are based on my personal review of the weapons systems described above and upon my personal estimates of the possible and probable effects of inappropriate disclosures of information relating to those systems.

23. The defensive weapons installed in the USS STARK represent significant advancements in technology over corresponding systems in earlier classes of ships. Disclosure of such information would be particularly harmful because of the large number of Oliver Hazard Perry class frigates and other ships equipped with those defensive weapons, and the lengthy period of service expected of those ships.

24. Disclosure of the rules of engagement under which USS STARK operated would enable potential adversaries to predict more accurately the rules governing U.S. Navy ships in high threat environments. With such knowledge, an adversary could take action against an American vessel with greater assurance that an American response was prohibited, or could graduate its provocations, and time the massing of its forces, in a way calculated to disable the United States.

25. The civil actions before these courts are predicated upon the design, manufacture, testing, use and maintenance of weapons systems employed aboard the USS STARK. Considering the classified nature of that subject matter, the development of evidence during the course of discovery and presentation of that information at trial unavoidably will call for information which is classified. Specifically, classified

information relating to the potential military uses of those weapons systems will be called for, either directly or by a process of elimination. Even if the parties attempted to exclude requests for classified information, I believe there is a substantial risk such information would be released inadvertently. Accordingly, I view my responsibility to protect the national security as requiring that I invoke the extraordinary measure of asserting a formal claim of the State Secrets Privilege over any information which would indicate, directly or indirectly, the classified technical information concerning the weapons systems at issue.

26. I certify that it would prejudice the national security to disclose the particular classified facts concerning these systems and the rules of engagement and I have personally determined that the claims which I now assert in this declaration are appropriate under the circumstances.

27. Upon personal consideration of this matter, including the types of classified information which plaintiffs would require to provide their *prima facie* case, it is my determination that disclosure of such information would impair the national security of the United States.

28. For these reasons, I invoke the "states secrets" privilege and deny access to such information in this lawsuit.

29. I declare under penalties of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

5 September 1990

/s/ _____
H. Lawrence Garrett, III
Secretary of the Navy