Carol BENTZLIN, et al., Plaintiffs,

v.

HUGHES AIRCRAFT COMPANY; GM
Hughes Electronics; and Does 1
through 20, Inclusive, Defendants.

No. CV 92–3314 JSL.

United States District Court,
C.D. California.

Sept. 22, 1993.

Joel W.H. Kleinberg, Los Angeles, CA, for plaintiffs.

Raymond B. Biagini, McKenna & Cuneo, Washington, DC, for defendants.

## AMENDED ORDER GRANTING MOTION TO DISMISS

LETTS, District Judge.

By order, entered December 28, 1992, this court granted the motions of defendants Hughes Aircraft Company and GM Hughes Electronics and intervenor United States to dismiss plaintiffs' action. The court indicated that an opinion would follow, setting forth in detail the basis of its decision. That opinion is set forth below.

## I. FACTS

This case arises out of the accidental deaths of six members of the United States Marines Corps ("USMC") on January 29, 1991 during Operation Desert Storm, in the course of the Persian Gulf War. At the United States' request, this court takes judicial notice of the following facts.

On August 2, 1990, Iraqi military forces invaded neighboring Kuwait. On January 14, 1991, the United States Congress authorized the use of military force to secure the removal of Iraqi forces from Kuwait. On January 18, President Bush ordered the ready reserves of the armed forces to active duty, and on January 21, 1991, designated the land and airspace above Kuwait, Saudi Arabia, and other areas and adjacent waters as areas in which the armed forces would be engaged in combat.

Plaintiffs are family members of Marines who were killed in combat near the border of Kuwait and Saudi Arabia. According to plaintiffs, the Marines were riding in a light armored vehicle toward enemy Iraqi land forces, when a Maverick AGM–65D missile, fired from a U.S. Air Force A–10 aircraft, struck the vehicle and killed the Marines. Plaintiffs claim that a manufacturing defect caused the missile to deviate from its intended target and strike the Marines.

On May 4, 1992, plaintiffs brought suit against defendants Hughes Aircraft Company and GM Hughes Electronics ("Hughes"), the manufacturers of the missile, on state tort law causes of action. The first count, negligence, alleges that defendants "negligently and carelessly manufactured, tested, inspected, stored, transported, distributed, and controlled [the] ... Maverick missile." (Complaint at 3.) The second count alleges that defendants should be held accountable under strict liability for the defective manufacture of the missile.

Defendants moved to dismiss plaintiffs' complaint on the grounds that the political question doctrine renders the case nonjusticiable, the state secrets privilege bars adjudication of the case, and federal common law preempts state law tort actions against government contractors that arise out of combat. The United States, as intervenor in this action, moved to dismiss the case under the political question and state secrets doctrines. Secretary of the United States Air Force Donald B. Rice and Acting Secretary of Defense Donald J. Atwood submitted separate declarations, in which they asserted the state secrets privilege, barring discovery, over classified information regarding, *inter alia*, the Maverick missile's capabilities, the tactics employed by the A–10 aircraft, and military orders executed during the Persian Gulf War.[1]

---

1. Secretary of the Air Force Rice took the "extraordinary measure of asserting a formal claim of the 'military and state secrets' privilege over

any information which would indicate, directly or indirectly, ... classified information concerning the AGM–65D Maverick missile, A–10 [air-

## II. ANALYSIS

### A. *Plaintiffs' State Law Tort Action Against Hughes is Preempted by Federal Common Law Immunizing Government Contractors from Tort Claims*

The first ground upon which the court dismisses the complaint is that it is preempted by a federal common law defense for government contractors.[2]

The leading case to apply the preemption doctrine to suits against military contractors is *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988). In *Boyle*, the Supreme Court held that the district court was required to dismiss a tort suit brought by the survivors of a soldier killed in a helicopter crash in the course of training; the suit sought recovery against the helicopter's manufacturer on the grounds that the emergency escape system was defectively designed.

The Supreme Court, in reaching its decision, noted that "[in] a few areas, involving 'uniquely federal interests,' ... state law is preempted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the court—so called 'federal common law.' " *Boyle*, 487 U.S. at 504, 108 S.Ct. at 2514 (citations omitted). The Court then went on to undertake such a preemption analysis and fashioned a "government contractor defense" which immunizes contractors from state tort liability for activities that they are required to perform pursuant to federal contracts.[3]

---

craft] tactics, and the TEMP [*i.e.*, Hughes' Testing and Evaluation Master Plan, a document concerning the continuing development of the AGM–65D missile system]." (Rice Decl. at 7.) Rice noted that plaintiffs had already sought to discover TEMP, a document whose disclosure would reasonably be expected to cause serious damage to the United States' national security. Rice also stated that even if the parties attempted to exclude requests for classified information, there was a substantial risk that classified information would be released inadvertently. *Id.* at 6.

Acting Secretary of Defense Atwood invoked the state secrets privilege over three categories of classified information:

(1) Intelligence information regarding Iraqi electronic countermeasures capabilities and equipment, some of which relates to the combat missions of A–10 aircraft during Operation Desert Storm;

(2) Information involving the air operations of A–10 aircraft during Desert Storm, including (a) rules of engagement, *i.e.*, the orders commanders and aircrews operate under in determining whether and when to employ weapons and defensive systems, (b) air tasking orders, *i.e.*, instructions used to coordinate aircraft, and (c) special instructions; and

(3) Intelligence information contained in a computer generated analysis of a country's radar capabilities and vulnerabilities. (Atwood Decl. at 4.)

Acting Secretary of Defense Atwood specifically emphasized the confidentiality of information regarding the electromagnetic environment during the Gulf War, including a "variety of radars, jamming, counter- and counter-countermeasure devices." *Id.* at 8. Atwood emphasized that he invoked the state secrets privilege over the rules controlling the decisions made by military commanders and the personnel implementing the rules, including pilots engaged in hostile contact. *Id.* at 10.

**2.** Each of the alternative grounds for dismissal—preemption, state secrets privilege, and political question—are interrelated in their logic. This court chooses to rely on the preemption doctrine since it provides grounds for dismissal on the pleadings. In contrast, as discussed below, before a court can dismiss a claim under the state secrets doctrine, the United States must assert privilege and the court must determine that the claim cannot be litigated without the privileged evidence.

**3.** Even before the Supreme Court's decision in *Boyle*, lower courts applied the "government contractor defense" to dismiss claims. For example, the court applied the defense to dismiss the claims of Vietnam veterans and their families who opted out of a class action settlement with the manufacturers of the Agent Orange herbicide. The court dismissed the claims of the individual plaintiffs, finding that:

[i]t is clear from the record, in light of all the information received to date, that the government knew as much as, or more than, the defendant chemical companies about the possible adverse health effects of Agent Orange as it was used in Vietnam.... Such a governmental decision falls within the discretionary function exception to liability under the Federal Tort Claim Act.

*In re Agent Orange Product Liability Lit.*, 611 F.Supp. 1223, 1263–64 (E.D.N.Y.1985). *See also In re Agent Orange Product Liability Lit.*, 534 F.Supp. 1046, 1056–57 (E.D.N.Y.1982) (court noted, without deciding, that the "government contractor defense" would preclude plaintiffs' suit against the chemical companies if the companies could show that (1) the government established the specifications for Agent Orange, (2) the Agent Orange manufactured by the companies met the government specifications, and (3) the government knew as much or more than the companies about the risks of Agent Orange.)

*Id.* at 511, 108 S.Ct. at 2518. *Boyle* explicitly held that the "government contractor defense" applies to design defects; the Court did not directly address whether the defense might be extended to limit liability allegedly resulting from manufacturing defects or other defects unrelated to product design. *Id.,* at 511, 108 S.Ct. at 2518.[4]

Plaintiffs have attempted to plead their complaint around the *Boyle* decision by alleging, on information and belief, but without supporting evidence, that their claims arose from a manufacturing defect rather than a design defect. Plaintiffs now wish to conduct discovery to establish the truth of their allegations. Plaintiffs' suit and discovery requests, however, demonstrate that the preemptive effect of the "government contractor defense" must also extend to certain claims pleaded as manufacturing defect suits.

■ Two grounds require preemption in the instant case. First, the "government contractor defense" necessarily extends to preclude manufacturing defect claims, such as plaintiffs', against the manufacturers of sophisticated high-technology military equipment ("high-tech preemption"). High-tech equipment is defined as that which only has use in combat and which has no civilian analog. Second, the "government contractor defense" necessarily extends to suits, such as plaintiffs', which arise from wartime activity ("combat preemption").

### 1. *Boyle Preemption Analysis*

The rationale upon which the *Boyle* Court fashioned a federal common law defense against design defect claims supports preemption of plaintiffs' tort suit on both high-tech and combat preemption grounds.

The *Boyle* Court's preemption analysis involved a two step process. First, the court must determine whether a case involves an area of "uniquely federal interests." *Id.* at 504, 108 S.Ct. at 2514. Second, the court must decide whether "a 'significant conflict' exists between an identifiable 'federal policy or interest and the operation of state law.'" *Id.* at 507, 108 S.Ct. at 2516 (citations omitted). If both conditions exist, the state law claims will be preempted by federal common law. As a corollary, in analyzing whether there is a conflict between state law and federal policy, the court must determine the scope of displacement of state law.

In *Boyle,* the Supreme Court found the procurement of military equipment to be a uniquely federal interest. It then determined that this interest would be frustrated if contractors were subject to state tort suits for injuries resulting from product design defects. The Court noted that the government is intimately involved in the design of military products, and reasoned that state law would conflict sharply with federal policy if contractors were held liable for specifically carrying out government-approved specifications for equipment. *Id.* at 505–08, 108 S.Ct. at 2515–16. The Court limited the scope of displacement of state law to suits alleging defectively designed equipment for which the government has approved the design specifications, thereby fashioning the federal common law "government contractor defense" which immunizes contractors against such suits.[5] The Court rooted this defense in the

---

**4.** Some courts have suggested that the defense does not generally apply to preempt claims brought as manufacturing defects. *Compare Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 246 (5th Cir.1990) (citations omitted) ("'[F]ederal law provides no defense to the military contractor that mismanufactures military equipment or that is itself ultimately responsible for the design defect.'") *and McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 451 (9th Cir.1983) (in dictum, noting that the government contractor defense does not relieve suppliers of military equipment of liability for defects in the manufacture of that equipment), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) *with Harduvel v. General Dynamics Corp.,* 878 F.2d 1311 (11th Cir.1989) (certain state law "manu-

facturing defect" suits can be preempted), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). As discussed at *infra* note 8, this court rejects a distinction between design and manufacturing defect suits which the government asserts should not be brought. The cases recognizing a distinction between manufacturing and design defect suits have not contemplated situations where the government asserts an interest against the case being brought.

**5.** The Court adopted a specific test for preemption:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved rea-

"discretionary function" exception to the Federal Tort Claims Act ("FTCA"), which reserves the government's sovereign immunity for claims arising out of the government's discretionary policy-making decisions. 28 U.S.C. § 2680(a) (1988).

> [T]he selection of the appropriate design for military equipment ... is assuredly a discretionary function within the meaning of [the FTCA] ... [involving] judgment as to the balancing of many technical, military, and even social considerations.... [P]ermitting 'second-guessing' of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.

*Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518.

### 2. *Application of Boyle Preemption to Plaintiffs' Case*

#### (a) *Government Contract Defense for Manufacturing Defect Suits Arising from the Use of Sophisticated "Combat Use Weaponry"*

▉ Analysis of this case begins, as in *Boyle*, with the given that procurement of military equipment involves a uniquely federal interest. Since *Boyle* involved the alleged design defect of a military helicopter in peacetime, and this case involves the alleged manufacturing defect of a missile in wartime combat, the precise analysis of the conflict between federal interest and state law, and the degree to which state law must be preempted differs from that in *Boyle*, although the general structure of reasoning is the same.

The federal interest is even stronger in plaintiffs' case than in *Boyle*; the court takes note that the product involved in this case—a Maverick missile—is a technically sophisti-

cated weapon which has no civilian counterpart and is manufactured *solely* for use in combat.[6] It is a single purpose, single use product which is designed to self-destruct, and by its nature, it cannot be field-tested. The military helicopter in *Boyle* certainly has special features unique to the military, but the overall product is one derived from a general commercial design. The missile, in contrast, by its very nature, has a design unique to its military combat purpose.

The federal interest in procuring sophisticated combat weaponry, such as the Maverick missile, is impinged upon by state tort manufacturing defect suits, and not only design defect suits which were addressed by the *Boyle* Court. This is due primarily to the strong government interest in protecting against the disclosure of the design and capabilities of such weaponry. No information concerning the design and capabilities of the Maverick missile can be discovered without interfering with national security. Even in a manufacturing defect suit, plaintiffs must prove proximate causation, which necessitates the disclosure of a product's design. Certainly, defendants would defend the suit by reference to the product's design.[7]

In the case of sophisticated weaponry designed exclusively for combat use, it must be presumed that any proceedings under state law which would require the government to make disclosures concerning the design of such equipment would interfere with the federal government's interest in obtaining and using such weaponry. In single use military products such as the Maverick missile, design and manufacturing are interrelated. Therefore such cases must be dismissed on the pleadings, without requiring the government to assert privilege.

sonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Id.* at 512, 108 S.Ct. at 2518.

**6.** Other examples of such equipment might include most air defense systems, sophisticated guns and other weapons designed specifically for military use.

**7.** Disclosure of such design may produce a direct threat to American soldiers. As Acting Secretary of Defense Atwood noted in his declaration, "war remains a life and death struggle in which minimizing our own casualties is often dependent upon superior information gathered both before and during actual hostilities." (Atwood Decl. at 7.)

Of course, not all military equipment is based on design which cannot be disclosed without impinging on federal interests, and therefore this preemption doctrine is limited to combat equipment with no civilian counterpart. For example, information regarding a two and a half ton truck based on a standard design which has not changed since World War II, may properly be in the public domain. Under this analysis, it might not be necessary to dismiss a suit, alleging a manufacturing defect, on the pleadings. If a particular truck possessed unique military features whose disclosure would harm national security, the government could assert state secrets privilege over those aspects of the truck for which the design is unique to the military, barring discovery. A suit which implicates the design of such aspects of the product may be dismissed after the privilege has been asserted.[8]

A military helicopter, such as that at in issue in *Boyle*, presents a more difficult case to determine whether to presume that a manufacturing defect case cannot be brought. Although a military helicopter's basic structure may be based on standard commercial design, many of its features are unique to the military, and based on design or manufacturing processes which should not be disclosed. In cases implicating such features, it may seem unnecessarily burdensome to require the government to assert privilege before dismissing the suit. That case, however, is not before this court.[9] The Maverick missile instead poses a clear example of a suit which must be barred on the pleadings, even without assertion of privilege since no aspect of a missile's design may ever be disclosed.

An additional reason for the preemption of such suits is the government's interest against the disclosure of its role in the manufacture of technically sophisticated weapons. This court understands the entire production process of sophisticated combat weaponry, such as the Maverick missile, to be generally subject to security clearance and quality control by the government, which therefore involves the government in the actual manufacture of such weaponry.[10] For example, the government may direct that certain time or cost-saving procedures be employed in the

---

8. Alternatively, this court believes that such a suit could be dismissed, when brought on behalf of soldiers, if the government merely asserted that it should be dismissed, without a formal assertion of state secrets privilege. As discussed at *supra* note 4, a distinction between manufacturing and design defect suits is improper with respect to manufacturing defect cases where the government has intervened and taken the position that a case cannot be brought without undermining federal interests.

This is because even a manufacturing defect suit has the potential to interfere with the government's interest in procuring military equipment. Tort liability from manufacturing suits generally is passed on to the consumer; in the case of military hardware, the sole consumer is the government, and potential tort costs will be passed on to the government.

The threat of manufacturing defect liability will result in either the manufacturer incurring liability in suits or in the manufacturer installing so much oversight in the manufacture of equipment that it increases the costs of producing equipment. Either cost will be reflected in the price of the equipment. The increased costs from potential liability could make certain equipment so expensive that the manufacturer would decline to produce the equipment, and thus preclude government from obtaining such equipment.

When the government asserts that a manufacturer of certain equipment should not face liability, even for alleged manufacturing defects, after determining that its interest in obtaining that equipment is paramount, this court does not think that state tort liability should be allowed to undermine the government's determination.

The court's belief does not conflict with the longstanding rule that liability for manufacturing defects exists against government contractors unless the government has formally taken a position that such a suit should not be maintained. For example, in *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), the Ninth Circuit, in dictum, recognized that government contractors are not relieved of liability for manufacturing defects caused by them. The Ninth Circuit however did not address the situation where the government has asserted an interest against a manufacturing suit brought against the contractor.

9. The issue of a manufacturing suit was not before the *Boyle* Court, and therefore, one can only speculate how the Court would have decided that case.

10. At the pleading stage, the degree to which the manufacture of the Maverick missile is subject to military security clearance and on-site government quality controls is not before the court, and in this court's opinion, they never should be.

manufacturing of a missile, making decisions in a tradeoff between risk and costs. The disclosure of the extent to which the government knowingly accepts tradeoffs between product quality and price of weaponry cannot be a legitimate concern of civil discovery.

As in *Boyle*, and in part for the same reason, this court roots this defense against manufacturing defects for sophisticated weaponry in the "discretionary function" exception to the FTCA. 28 U.S.C. § 2680(a) (1988). That provision protects against interference with the federal government's exercise of its judgment as to the "balancing of many technical, military and even social considerations...." *Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518. Because the government involves itself in the manufacturing process of such weaponry through the security clearance procedure, tort suits would interfere with discretionary decisions made by the government; a suit against the manufacturer ultimately would interfere with the same interests as a suit against the United States. Alternatively, this defense could be rooted in the penumbra surrounding the "state secrets" doctrine; as discussed below, in large part, these suits may not be brought to the effect of disclosure on national security.

This preemption doctrine might seem unduly harsh if its preemptive effect were not limited to technically sophisticated products produced exclusively for combat use. It is not expected, however, that many suits involving such equipment will arise from non-combat circumstances, and product liability suits arising out of combat circumstances must be preempted for a number of additional compelling reasons, discussed in the next section.

(b) *"Combat Preemption": Government Contract Defense for Combatant Activities*

■ *Boyle* preemption analysis also supports preemption of manufacturing defect suits arising in the context of war, regardless of the level of sophisticated technology of the allegedly defective weaponry. Suits, such as plaintiffs, satisfy prong one of *Boyle's* preemption analysis not only due to the federal interest in military procurement, but because

they implicate the federal interest in controlling military policy in war.

The federal interests that exist in wartime would be frustrated by allowing state tort suits against government contractors that arise from wartime deaths, even when plead as manufacturing defect claims. In *Koohi v. United States*, 976 F.2d 1328 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993), the Ninth Circuit explicitly recognized such a government contractor defense and rooted it in the FTCA's express exception of waiver of sovereign immunity for "combatant activities" rather than in the "discretionary function" exception to the FTCA as in *Boyle*. 28 U.S.C. §§ 1346(b), 2680(j) (1988). The combatant activities exception manifests the federal interest in determining the duty of care in combat. The court held that this federal interest required the displacement of state tort suits which seek to impose a duty of care upon contractors where the federal government has determined none exists. The combatant activities exception generates a federal common law defense which immunizes manufacturers such as Hughes from state tort suits arising from war.

In *Koohi*, plaintiffs were relatives of passengers aboard an Iranian civilian aircraft that was shot down in July 1988 by the U.S.S. Vincennes, a naval cruiser, in a "tanker war", in which the United States was involved in military conflicts with Iran. The Vincennes, equipped with a computerized Aegis air defense system, mistook the civilian aircraft for an Iranian fighter plane, and accidentally fired upon the plane, killing all its passengers. Plaintiffs brought suit against the United States and the manufacturers of the Aegis Air Defense System.

The Ninth Circuit in *Koohi* dismissed the claims against the United States under the doctrine of sovereign immunity, relying on the "combatant activities" exception to the FTCA. The court further held that the manufacturer of the Aegis system similarly could not be held liable because the same interests furthered by the government's immunity from suit under the "combatant activities"

exception are implicated in a suit against the government contractor.[11]

Such a defense for manufacturers of equipment that allegedly malfunctions during combat arises from the fact that certain federal interests implicated in war—such as secrecy of wartime strategy and military morale—would be undermined by state tort suits against such manufacturers. In *Koohi*, the Ninth Circuit recognized three principles underlying the combatant activities exception to the FTCA. These principles are based on the premise that the objectives of tort law—deterrence, punishment, and providing a remedy to innocent victims—are inconsistent with the government's interests in combat, and thus tort law cannot be applied to government actions in combat. Similarly, the application of tort law to contractors for suits arising from combat would frustrate government combat interests.

First, tort law is based in large part on deterrence; tort liability is meant to make tortfeasors more careful. The *Koohi* court noted that in enacting the combatant activities exception, Congress recognized that it does not want the military to "exercise great caution at a time when bold and imaginative measures might be necessary to overcome enemy forces." 976 F.2d at 1334–35. During wartime, manufacturers similarly should not be made overly cautious in the production and transportation of weapons, since delay may lead to missed strategic opportunities and deaths of American soldiers.

Indeed, the federal interest in obtaining sophisticated military equipment as expeditiously as possible during wartime would be frustrated by allowing manufacturing defect suits against government contractors. The exigencies of war often require high-tech equipment to be delivered to the "front" as quickly as possible. In war, the benefit of producing weapons and transporting them as quickly as possible to arm American soldiers far outweighs the risks of defective workmanship; soldiers' lives may be lost as the result of delays in the delivery of weapons.[12] Exposing government contractors to tort liability, even for manufacturing defects, would place undue pressure on manufacturers to act too cautiously, even when the national interest would be better served by expedient production than defect-free weapons.

A second purpose of tort law is to punish tortfeasors. In enacting the combatant activities exception, Congress determined that the government should not be punished for mistakes made during war. This purpose of the exception similarly applies to government contractors, since tort law is not required to punish government contractors. The United States government is in the best position to monitor wrongful activity by contractors, either by terminating their contracts or through criminal prosecution. Government contractors, such as Hughes, which produce technologically advanced weaponry have ongoing business relationships with the United States government and rely on these relationships for their economic sustenance. Private individuals simply are not in the busi-

---

11. The court reasoned that "during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action" by either the government or government contractors. *Koohi*, 976 F.2d at 1337. Since the Aegis defensive system's purpose was, in part, "to protect the lives of United States servicemen ... [and] not to protect the lives of enemy forces or persons associated with those forces," its manufacturers did not owe a duty of reasonable care to the Iranian civilians aboard the Iranian airbus, and thus could not be liable to them in tort. *Id.*

12. Plaintiffs' claims included allegations that defendants negligently (1) manufactured, (2) transported, and (3) controlled the Maverick missile. In the Persian Gulf War, so far as is known, all of the military hardware employed was manufactured in peacetime circumstances. One would

assume, however, Hughes was involved in transport of weaponry during the war.

Furthermore, the short war with Iraq, while not without precedent, still cannot be regarded as the combat norm. It is not the type of war in which most military casualties are suffered. In large scale wars of longer duration, such as World War II, Korea and Vietnam, much, if not most, military production is for immediate use during the war. When necessary to meet superior enemy capabilities, new equipment is often designed, produced and rushed into service with only minimal testing and in very different training circumstances. In exigent circumstances, military hardware may be used in ways never contemplated by those who designed and manufactured it. The concept of "foreseeability" has almost no meaning.

ness of buying Maverick missiles. The government therefore is in a position to control the quality of work by its contractors through the threat of terminating business relationships with contractors who manufacture defective equipment as well as the threat of bringing criminal suits against contractors whose misconduct is egregious.

Finally, tort law is intended to provide a remedy to innocent victims. The *Koohi* court recognized that the "combatant activities" exception is grounded, in part, on the fact that victims of war cannot be compensated differently from each other:

> War produces innumerable innocent victims of harmful conduct—on all sides. It would make little sense to single out for special compensation a few of these persons ... on the basis that they have suffered from the negligence of our military forces rather than from the overwhelming and pervasive violence which each side intentionally inflicts on the other.

*Id.* at 1334–35. This principle applies even when the suit is against a government contractor, rather than the government itself. There can be no difference in compensation for those that die in war, even when the cause is a manufacturing defect.

Indeed, the federal interest in maintaining the military dignity of casualties suffered by soldiers fighting a war on behalf of the United States would be harmed by allowing soldiers killed or injured in war to bring suits against military contractors. Unfortunately, soldiers die and are injured in combat. Casualties are contemplated prior to war and judged to be a necessary consequence of the decision to go to war. Deaths and injuries of soldiers in war arise from a plethora of circumstances, many of which may be judged to involve some degree of fault. Unsuccessful military strategy, unwise orders by individual officers and mistakes by fellow soldiers all lead to the loss of life, and these causes clearly do not give rise to civil liability. Neither do the deliberate acts of an enemy soldier give rise to liability. Where a deliberate choice has been made to tolerate tragedy for some higher purpose, civilian state law standards cannot be applied to those who suffer the tragedies contemplated in war.

Plaintiffs present this as a case which calls for no exception to the general California rule that those injured as a result of the defective manufacture of products may sue for compensation. Plaintiffs argue that *Koohi* is limited on its terms to extending a government contractor defense to suits brought by "enemies" of the United States, and not to those brought on behalf of our own soldiers. Plaintiffs argue that manufacturers owe a duty of reasonable care—of providing non-defectively manufactured weapons—to American servicemen, on whose behalf a state law tort suit may be maintained when that obligation is not met. This court finds plaintiffs' arguments unpersuasive.

While it is true that *Koohi* is limited in its precise holding to suits brought by so-called "enemies" of the United States, *see supra* note 11, nothing in the *Koohi* court's decision suggests that its reasoning was intended to be narrowly construed. For the same reasons that the United States has chosen not to waive its sovereign immunity to tort suits arising from wartime deaths, a government contractor who manufacturers the weapons of war cannot be held liable for deaths of American soldiers arising from combat activity.

The plaintiffs are asking the court to depart from the rule that those injured while fighting for their country have no right to be compensated under state law for injuries sustained in combat, regardless of how, or by whose fault, the injuries are caused. This court sees no advantage to be gained from carving out a differential compensation scheme for certain survivors of soldiers killed or injured in war, judging one mechanism of death in war to be preferred over another. In a wartime context, state law cannot establish the duty of care owed to American soldiers who necessarily assume the risk of death.

In addition to the *Koohi* court's reasoning, which this court finds wholly persuasive, the court recognizes the following reasons for preemption. First, state tort suits arising from combat frustrate the federal interest in ensuring the secrecy of wartime military de-

cision-making due to the causation issues that arise in such suits. As noted above, war can lead to the deaths and injuries of thousands of soldiers by all participants. To prevail in a manufacturing defect suit, plaintiffs would have to establish that soldiers' deaths were caused by a manufacturing defect and not by poor strategy by the United States military, individual error, or even deliberate decisions by the military to use equipment that may be flawed but gives overall strategic advantage to the United States. During war, the United States Defense Department may authorize the use of equipment that might not be authorized in less urgent times, or it may waive, expressly or impliedly, standard manufacturing procedures. The balancing of the interests of fitness of design, quality of manufacture, immediacy of delivery, and thoroughness of training is essential to the conduct of war. Decisions must be made and compromises accepted in the national interest by the government and its contractors without fear of the consequences of civil liability. Indeed, federal interests would be frustrated if discovery was required to determine whether a malfunction was caused by the United States' wartime policy or a manufacturer's shoddy workmanship.

Additionally, a significant practical problem which would inevitably arise if manufacturing suits arising from combat incidents were allowed to go forward is the problem of accumulating and retaining evidence. Preserving and maintaining evidence from the scene of an accident is essential to the ability to prosecute product liability claims.[13] In wartime, it would be inappropriate to have soldiers assembling evidence, collected from the "battlefield." Additionally, allowing such claims would require soldiers to testify for

and against each other's interests, potentially undermining the unity of the forces.

B. *The Assertion of State Secrets Privilege Precludes Adjudication of Plaintiffs' Claims*

■ Alternatively, dismissal of plaintiffs' suit is required because the government's assertion of the state secrets privilege raises an evidentiary barrier to the adjudication of plaintiffs' claims.

■ The state secrets privilege is a common law evidentiary rule that allows the Government to withhold from discovery military secrets whose disclosure would be harmful to national security.[14] The effect of the privilege is to exclude the evidence from the case. *See Ellsberg v. Mitchell,* 709 F.2d 51, 65 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984).

■ "A court before which the privilege is asserted must assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure of the particular facts in litigation will jeopardize national security." *Zuckerbraun v. General Dynamics Corp.,* 935 F.2d 544, 546–47 (2d Cir.1991). Invocation of the state secrets privilege may require dismissal. If proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a *prima facie* claim, dismissal is appropriate. *Id.* at 547 (citations omitted). Similarly, if the court determines that the privilege so impairs the defendant in establishing a valid defense that the trier is likely to reach an erroneous conclusion, dismissal is also proper. *Id.* (citation omitted).

In this case, the United States has fully satisfied the requirements to assert the state

---

13. The unique circumstances of this case made it possible to preserve and examine evidence; in fact, the United States is in possession of a part recovered from the allegedly defective missile. *See* Matthews Decl. at ¶ 3. This, however, is not to be generally expected in combat situations. In this case, the scene of the accident was left undisturbed; it was the government itself which preserved and examined the evidence as part of its own military investigation, precisely because the product involved was a missile. One suspects that if the product had been a truck or rifle, no such effort would have been employed by the

government. In those cases, it would be untenable for an injured soldier or his fellow soldiers to collect the evidence necessary to bringing a tort suit.

14. *See United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 531–32, 97 L.Ed. 727 (1953) (citations omitted) ("There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.")

secrets privilege. Secretary of the Air Force Rice and Acting Secretary of Defense Atwood made formal claims of privilege, filed with the court, over information regarding the Maverick missile's capabilities, the A–10 aircraft's tactics, and the "rules of engagement" during Operation Desert Storm, including orders by commanders and pilots. They did so after personally determining that disclosure of such evidence would threaten national security.

The extrinsic evidence indicating that the disclosure of such information would threaten national security is so strong that this court finds the privilege to be properly asserted, even without an *in camera* review of the privileged information. *See United States v. Reynolds*, 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953) (the fact that a military aircraft had been engaged in a secret mission was sufficient to induce the court to forego *in camera* inspection of documents relating to its crash.) The court reaches this conclusion because this case arises in the context of war, and as asserted in the declaration of Secretary Rice, the Maverick missile continues to be an important weapon in the United States' arsenal; as such, any discovery into its capabilities could hamper its future use. (Rice Decl. at 3.)

This court sees no way for this suit to go forward because the state secrets privilege bars disclosure of information necessary to establishing both plaintiffs' *prima facie* case and Hughes' defenses. Plaintiffs have not shown that they will be able to maintain a case without the disclosure of privileged information. Plaintiffs have pleaded this case against the manufacturers of the missile; yet they do not have one scintilla of evidence that it was the manufacturer who caused the deaths of the Marines. To prove their case, plaintiffs must show (1) the missile was de-

fectively manufactured, and (2) the defective manufacturing caused the Marines' deaths. Plaintiffs appear to expect to prove their case through circumstantial evidence and a process of eliminating other possible causes of the "friendly fire" incident.[15]

Even the limited discovery requests of plaintiffs require disclosure of classified information. Acting Secretary of Defense Atwood asserted state secrets privilege over information regarding the (1) Maverick missile's survivability and vulnerability to countermeasures, (2) its vulnerability to electromagnetic radiation, and (3) the effectiveness of its counter-countermeasures. Plaintiffs requested that Hughes be compelled to declare that the Maverick missile struck the Marines because it was affected by one of these factors before their case is dismissed. However the very admission or denial that the missile was affected by Iraqi countermeasures or the electromagnetic environment discloses information about its capabilities, which are protected by state secrets.

Furthermore, even if plaintiffs could show that the missile was defectively manufactured, the state secrets privilege seriously prejudices Hughes' ability to defend against plaintiffs' case. For example, Hughes might attempt to defend this "manufacturing defect" suit by claiming that the missile's striking of the Marines' vehicle was caused by pilot error, that the deceased Marines negligently travelled into a restricted area, or the missile had been defectively designed.[16] In determining whether a manufacturing defect was the proximate cause of the deaths of the Marines, an examination of the relevant decisions rendered regarding when and how the missile would be used would be necessary. The adjudication of the manufacturing defect claim against Hughes would require disclosure of the Maverick's design, capabilities,

---

**15.** Plaintiffs filed the affidavit of Sam W. Matthews, a former Manager of Special Projects in the Maverick program office at Hughes, in which he asserts that it is possible to discover information about the specific manufacturing history of the errant Maverick missile since there are photos of a salvaged part of the destroyed missile containing its serial number. Even if plaintiffs can discover the manufacturing history of the missile, proof of defective manufacturing would require discovery into the government specified

design, which is protected from discovery by the state secrets privilege.

**16.** Secretary Rice noted that Maverick missiles have a 90% (not 100%) success rate for hitting targets. (Rice Decl. at 3.) It appears plausible that the United States may have approved a defect which caused the Marines' deaths, although such information, of course, is protected under the state secrets doctrine.

operation, and combat performance. This information, as set forth in the declarations by the Secretary of Air Force and Acting Secretary of Defense, is protected from disclosure under the state secrets privilege.[17]

Plaintiffs' case is similar to *Bareford v. General Dynamics Corp.*, 973 F.2d 1138 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993), in which the Fifth Circuit affirmed dismissal of a case brought by family members of Navy sailors killed during the 1988 attack on the U.S.S. Stark by an Iraqi jet fighter in the Persian Gulf against manufacturers of the defensive systems of the Stark. The court found that even if plaintiffs could point to problems with the manufacture and testing of the defensive system, that alone could not establish a *prima facie* case. *Id.* at 1142. The case, even though framed as a manufacturing defect case, could not be resolved without access to detailed data regarding the design of the systems, which are protected from disclosure by state secrets.

## C. *The Political Question Doctrine Renders Plaintiffs' Suit Nonjusticiable*

■ Finally, plaintiffs' suit alternatively must be dismissed because it necessarily raises nonjusticiable "political questions." In *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), the Supreme Court noted six factors indicative of a political question outside the scope of judicial review:

■ a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

■ a lack of judicially discoverable and manageable standards for resolving it; or

■ the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

■ the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

■ an unusual need for unquestioning adherence to a political question already made; or

■ the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

The political question doctrine is a function of the separation of powers doctrine and the inherent limits of the Judiciary's capabilities.

As noted above, proving plaintiffs' case requires inquiry into other possible causes of the friendly fire incident. No trier of fact can reach the issue of manufacturing defect without eliminating other variables which necessarily involve political questions. Plaintiffs' claims necessarily require inquiry into military strategy and, more specifically, orders to A–10 pilots and ground troops. The Marines' deaths occurred during the war. The conduct of such affairs are constitutionally committed to the Executive Branch under the President as Commander-in-Chief. Thus plaintiffs' claims implicate factors [1], [4], [5], and [6] of *Baker v. Carr.* The policy decisions made in war are clearly beyond the competence of the courts to review, implicating factors [2] and [3] of *Baker.*

In *Koohi,* the Ninth Circuit rejected "political question" as a basis for dismissing plaintiffs' claims arising from the U.S.S. Vincennes warship's shooting down of a civilian passenger plane during an undeclared tanker war. "[T]he fact that the plaintiffs' lawsuit involves the operation of a United States warship does not render it beyond judicial cognizance. Nor is the lawsuit rendered judicially unmanageable because the challenged conduct took place as part of an authorized military operation." 976 F.2d at 1331.

The *Koohi* court's rejection of the political question doctrine as a basis for dismissal, however, does not preclude this court's reliance on the political question doctrine. *Koohi* involved claims on behalf of civilians; tort suits brought by civilian plaintiffs are clearly within the judicial system's expertise. In contrast, plaintiffs' suit is brought on behalf

---

**17.** For example, Acting Secretary of Defense Atwood asserted privilege over the rules by which the pilot made the firing decision and the mis-

sile's susceptibility to Iraqi counter-surveillance forces. (Atwood Decl. at 10.)

of soldiers, serving within the Executive Branch.

This court notes that generally, civilians injured at the hands of the military do not raise political questions; soldiers injured at the hands of the military raise political questions. The relationship between soldiers and the military is indubitably within the province of the Executive. Indeed, the Supreme Court has recognized that "[t]he complex subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). Therefore the political question doctrine applies to plaintiffs' claims to provide alternative grounds for dismissal.

Thus, for the foregoing reasons, plaintiffs' suit is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.