SACK, Circuit Judge,
concurring in part and dissenting in part.
I. OVERVIEW
Last year, in Iqbal v. Hasty, 490 F.3d 143 (2d Cir.2007) (Newman, J.), cert. granted sub nom. Ashcroft v. Iqbal, — U.S. -, 128 S.Ct. 2931, — L.Ed.2d -, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015), “[w]e ... recognize[d] the gravity of the situation that confronted investigative officials of the United States as a consequence of the 9/11 attacks. We also reeognize[d] that some forms of governmental action are permitted in emergency situations that would exceed constitutional limits in normal times.” Id. at 159 (citation omitted). But, we pointed out,
most ... rights ... do not vary with surrounding circumstances, such as the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination. The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times.
Id.[1]
The majority fails, in my view, fully to adhere to these principles. It avoids them by mischaracterizing this as an immigration case, when it is in fact about forbidden tactics allegedly employed by United States law enforcement officers in a terrorism inquiry. Although I concur in some parts of the judgment, I respectfully dissent from its ultimate conclusion. I would vacate the judgment of the district court granting the defendants’ motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and remand for further proceedings
* * *
The plaintiff-appellant, Maher Arar, a resident of Ottawa, Canada, and a dual citizen of Canada and Syria,[2] alleges[3] that *194 on September 26, 2002, he was, by travel happenstance, a transit passenger at New York’s John F. Kennedy International Airport (“JFK Airport”) in Queens, New York. He had cut short a family vacation in Tunisia and was bound, he thought, for a business meeting in Montreal. What happened to him next would beggar the imagination of Franz Kafka.
When Arar sought to pass through the immigration check-point at JFK Airport in order to catch his connecting flight to Montreal, he was detained by U.S. agents who had been led to believe, on the basis of information provided by Canadian government officials, that Arar had connections with al Qaeda. FBI agents first, and then Immigration and Naturalization Service (“INS”)[4] officers, held Arar largely incommunicado at several locations in New York City for thirteen days, subjecting him to harsh interrogation under abusive conditions of detention.
Unable to acquire from him the information they sought, the agents attempted to obtain Arar’s consent to be removed to Syria. They expected Syrian officials to continue questioning him, but under conditions of torture and abuse that they, the U.S. government agents, would not themselves employ. When Arar declined to consent, the agents sent him to Syria against his will for the purpose, ultimately fulfilled, of having him held captive and further questioned under torture there.
Arar brought suit in the United States District Court for the Eastern District of New York on both statutory and constitutional grounds. He seeks damages from the federal officials he thinks responsible for his abuse. The district court dismissed the action for failure to state a claim upon which relief can be granted. This Court now affirms. I disagree in significant part, and therefore respectfully dissent in significant part.
II. THE FACTS AS ALLEGED IN ARAR’S COMPLAINT
The majority provides a strikingly spare description of the allegations of fact on the basis of which Arar mounts this appeal. The district court’s opinion, see Arar v. Ashcroft, 414 F.Supp.2d 250, 252-57 (E.D.N.Y.2006), by contrast, rehearses the facts in considerable detail. According to the district court, the complaint alleges the following facts, repeated here nearly verbatim.[5] They “are assumed to be true for purposes of the pending appeal[ ], as ... [is] required [when] ... reviewing a ruling on a motion to dismiss.” Iqbal, 490 F.3d at 147.

A. Arar’s Apprehension, Detention, and Forcible Transportation to Syria

Arar, in his thirties, is a native of Syria. He immigrated to Canada with his family when he was a teenager. He is a dual citizen of Syria and Canada. He resides in Ottawa.
*195 In September 2002, while vacationing with his family in Tunisia, he was called back to work by his employer[6] to consult with a prospective client. He purchased a return ticket to Montreal with stops[7] in Zurich and New York. He left Tunisia on September 25, 2002. (Arar, 414 F.Supp.2d at 252.)
On September 26, 2002, Arar arrived from Switzerland at JFK Airport in New York to catch a connecting flight to Montreal. Upon presenting his passport to an immigration inspector, he was identified as “the subject of a ... lookout as being a member of a known terrorist organization.” Complaint (“Cplt.”) Ex. D (Decision of J. Scott Blackman, Regional Director) at 2. He was interrogated by various officials for approximately eight hours.[8] The officials asked Arar if he had contacts with terrorist groups, which he categorically denied. Arar was then transported to another site at JFK Airport, where he was placed in solitary confinement. He alleges that he was transported in chains and shackles and was left in a room with no bed and with lights on throughout the night. (Arar, 414 F.Supp.2d at 253.)
The following morning, September 27, 2002, starting at approximately 9:00 a.m., two FBI agents interrogated Arar for about five hours, asking him questions about Osama bin Laden, Iraq, and Palestine. Arar alleges that the agents yelled and swore at him throughout the interrogation. They ignored his repeated requests to make a telephone call and see a lawyer. At 2:00 p.m. that day, Arar was taken back to his cell, chained and shackled, and provided a cold McDonald’s meal — his first food in nearly two days. (Id.)
That evening, Arar was given an opportunity to voluntarily return to Syria, but refused, citing a fear of being tortured if returned there and insisting that he be sent to Canada or returned to Switzerland. An immigration officer told Arar that the United States had a “special interest” in his case and then asked him to sign a form, the contents of which he was not allowed to read. That evening, Arar was transferred, in chains and shackles, to the Metropolitan Detention Center (“MDC”) in Brooklyn, New York,[9] where he was strip-searched and placed in solitary confinement. During his initial three days at MDC, Arar’s continued requests to meet with a lawyer and make telephone calls were refused. (Id.)
On October 1, 2002,[10] the INS initiated removal proceedings against Arar, who was charged with being temporarily inadmissible because of his membership in al *196 Qaeda, a group designated by the Secretary of State as a foreign terrorist organization. Upon being given permission to make one telephone call, Arar called his mother-in-law in Ottawa, Canada. (Id.)
Upon learning of Arar’s whereabouts, his family contacted the Office for Consular Affairs (“Canadian Consulate”)[11] and retained an attorney, Amal Oummih, to represent him. The Canadian Consulate had not been notified of Arar’s detention. On October 3, 2002, Arar received a visit from Maureen Girvan from the Canadian Consulate, who, when presented with the document noting Arar’s inadmissibility to the United States, assured Arar that removal to Syria was not an option. On October 4, 2002, Arar designated Canada as the country to which he wished to be removed. (Id.)
On October 5, 2002, Arar had his only meeting with counsel. The following day, he was taken in chains and shackles to a room where approximately seven INS officials questioned him about his reasons for opposing removal to Syria. His attorney was not provided advance notice of the interrogation, and Arar further alleges that U.S. officials misled him into thinking his attorney had chosen not to attend. During the interrogation, Arar continued to express his fear of being tortured if returned to Syria. At the conclusion of the six-hour interrogation, Arar was informed that the officials were discussing his case with “Washington, D.C.” Arar was asked to sign a document that appeared to be a transcript. He refused to sign the form. (Id. at 253-54.)
The following day (October 7, 2002), attorney Oummih received two telephone calls informing her that Arar had been taken for processing to an INS office at Varick Street in Manhattan, that he would eventually be placed in a detention facility in New Jersey, and that she should call back the following morning for Arar’s exact whereabouts. However, Arar alleges that he never left the MDC and that the contents of both of these phone calls to his counsel were false and misleading. (Id. at 254.)
That same day, October 7, 2002, the INS Regional Director, J. Scott Blackman, determined from classified and unclassified information that Arar is “clearly and unequivocally” a member of al Qaeda and, therefore, “clearly and unequivocally inadmissible to the United States” under 8 U.S.C. § 1182(a)(3)(B)(i)(V). See Cplt. Ex. D. at 1, 3, 5. Based on that finding, Black-man concluded “that there are reasonable grounds to believe that [Arar] is a danger to the security of the United States.” Id. at 6 (brackets in original). (Arar, 414 F.Supp.2d at 254.)
At approximately 4:00 a.m. on October 8, 2002, Arar learned that, based on classified information, INS regional director Black-man had ordered that Arar be sent to Syria and that his removal there was consistent with Article Three of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (“CAT”). Arar pleaded for reconsideration but was told by INS officials that the agency was not governed by the “Geneva Conventions” and that Arar was barred from reentering the country for a period of five years and would be admissible only with the permission of the Attorney General. (Id.)
Later that day, Arar was taken in chains and shackles to a New Jersey airfield, where he boarded a small jet plane bound for Washington, D.C. From there, he was flown to Amman, Jordan, arriving there on October 9, 2002. He was then handed *197 over to Jordanian authorities, who delivered him to the Syrians later that day. At this time, U.S. officials had not informed either Canadian Consulate official Girvan or attorney Oummih that Arar had been removed to Syria. Arar alleges that Syrian officials refused to accept Arar directly from the United States. (Id.)
Arar’s Final Notice of Inadmissability (“Final Notice”) ordered him removed without further inquiry before an immigration judge. See Cplt. Ex. D. According to the Final Notice: “The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with [CAT].” Id. It was dated October 8, 2002, and signed by Deputy Attorney General Larry Thompson. After oral argument in the district court on the defendants’ motions to dismiss, in a letter dated August 18, 2005, counsel for Arar clarified that Arar received the Final Notice within hours of boarding the aircraft taking him to Jordan. See Dkt. No. 93. (Arar, 414 F.Supp.2d at 254.)

B. Arar’s Detention in Syria

During his ten-month period of detention in Syria, Arar alleges, he was placed in a “grave” cell measuring six feet long, seven feet high, and three feet wide. The cell was located within the Palestine Branch of the Syrian Military Intelligence (“Palestine Branch”). The cell was damp and cold, contained very little light, and was infested with rats, which would enter the cell through a small aperture in the ceiling. Cats would urinate on Arar through the aperture, and sanitary facilities were nonexistent. Arar was allowed to bathe himself in cold water once per week. He was prohibited from exercising and was provided barely edible food. Arar lost forty pounds during his ten-month period of detention in Syria. (Id.)
During his first twelve days in Syrian detention, Arar was interrogated for eighteen hours per day and was physically and psychologically tortured. He was beaten on his palms, hips, and lower back with a two-inch-thick electric cable. His captors also used their fists to beat him on his stomach, his face, and the back of his neck. He was subjected to excruciating pain and pleaded with his captors to stop, but they would not. He was placed in a room where he could hear the screams of other detainees being tortured and was told that he, too, would be placed in a spine-breaking “chair,” hung upside down in a “tire” for beatings, and subjected to electric shocks. To lessen his exposure to the torture, Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan, even though he had never been to Afghanistan and had never been involved in terrorist activity. (Id. at 255.)
Arar alleges that his interrogation in Syria was coordinated and planned by U.S. officials, who sent the Syrians a dossier containing specific questions. As evidence of this, Arar notes that the interrogations in the United States and Syria contained identical questions, including a specific question about his relationship with a particular individual wanted for terrorism. In return, the Syrian officials supplied U.S. officials with all information extracted from Arar; plaintiff cites a statement by one Syrian official who has publicly stated that the Syrian government shared information with the United States that it extracted from Arar. See Cplt. Ex. E (January 21, 2004 transcript of CBS’s Sixty Minutes II: “His Year In Hell”). (Arar, 414 F.Supp.2d at 255.)

G. Arar’s Contact with the Canadian Government While Detained in Syria

The Canadian Embassy contacted the Syrian government about Arar on October *198 20, 2002, and the following day, Syrian officials confirmed that they were detaining him. At this point, the Syrian officials ceased interrogating and torturing Arar. (Id.)
Canadian officials visited Arar at the Palestine Branch five times during his ten-month detention. Prior to each visit, Arar was warned not to disclose that he was being mistreated. He complied but eventually broke down during the fifth visit, telling the Canadian consular official that he was being tortured and kept in a grave. (Id.)
Five days later, Arar was brought to a Syrian investigation branch, where he was forced to sign a confession stating that he had participated in terrorist training in Afghanistan even though, Arar states, he has never been to Afghanistan or participated in any terrorist activity. Arar was then taken to an overcrowded Syrian prison, where he remained for six weeks. (Id.)
On September 28, 2003, Arar was transferred back to the Palestine Branch, where he was held for one week. During this week, he heard other detainees screaming in pain and begging for their torture to end. (Id.)
On October 5, 2003, Syria, without filing any charges against Arar, released him into the custody of Canadian Embassy officials in Damascus. He was flown to Ottawa the following day and reunited with his family. (Id.)
Arar contends that he is not a member of any terrorist organization, including al Qaeda, and has never knowingly associated himself with terrorists, terrorist organizations or terrorist activity. Arar claims that the individual about whom he was questioned was a casual acquaintance whom Arar had last seen in October 2001. He believes that he was removed to Syria for interrogation under torture because of his casual acquaintances with this individual and others believed to be involved in terrorist activity. But Arar contends “on information and belief’ that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity.[12] Cplt. ¶ 2. (Arar, 414 F.Supp.2d at 255-56.)
Arar alleges that he continues to suffer adverse effects from his ordeal in Syria. He claims that he has trouble relating to his wife and children, suffers from nightmares, is frequently branded a terrorist, and is having trouble finding employment due to his reputation and inability to travel in the United States. (Id. at 256.)

D. U.S. Policy Related to Interrogation of Detainees by Foreign Governments

The complaint alleges on information and belief that Arar was removed to Syria under a covert U.S. policy of “extraordinary rendition,” according to which individuals are sent to foreign countries to undergo methods of interrogation not permitted in the United States. The “extraordinary rendition” policy involves the removal of “non-U.S. citizens detained in this country and elsewhere and suspected — reasonably or unreasonably — of terrorist activity to countries, including Syria, where interrogations under torture are routine.” Cplt. ¶ 24. Arar alleges on information and belief that the United States sends individuals “to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the Unit *199 ed States and other democracies.” Id. The complaint further alleges that the defendants “have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed.” Id. The complaint also alleges that the United States involves Syria in its “extraordinary rendition” program to extract counter-terrorism information. (Arar, 414 F.Supp.2d at 256.)
This “extraordinary rendition” program is not part of any official or declared U.S. public policy; nevertheless, it has received extensive attention in the press, where unnamed U.S. officials and certain foreign officials have admitted to the existence of such a policy. Arar details a number of articles in the mainstream press recounting both the incidents of this particular case and the “extraordinary rendition” program more broadly. These articles are attached as Exhibit C of his complaint. (Id. at 256-57.)
Arar alleges that the defendants directed the interrogations by providing information about Arar to Syrian officials and receiving reports on Arar’s responses. Consequently, the defendants conspired with, and/or aided and abetted, Syrian officials in arbitrarily detaining, interrogating, and torturing Arar. Arar argues in the alternative that, at a minimum, the defendants knew or at least should have known that there was a substantial likelihood that he would be tortured upon his removal to Syria. (Id. at 257.)

E. Syria’s Human Rights Record

Arar’s claim that he faced a likelihood of torture in Syria is supported by U.S. State Department reports on Syria’s human rights practices. See, e.g., Bureau of Democracy, Human Rights, and Labor, United States Department of State, 2004 Country Reports on Human Rights Practices (Released February 28, 2005) (“2004 Report”). According to the State Department, Syria’s “human rights record remained poor, and the Government continued to commit numerous, serious abuses ... includ[ing] the use of torture in detention, which at times resulted in death.” Id. at 1. Although the Syrian constitution officially prohibits such practices, “there was credible evidence that security forces continued to use torture frequently.” Id. at 2. The 2004 Report cites “numerous cases of security forces using torture on prisoners in custody.” Id. Similar references throughout the 2004 Report, as well as State Department reports from prior years, are legion. See, e.g., Cplt. Ex. A (2002 State Department Human Rights Report on Syria). (Arar, 414 F.Supp.2d at 257.)[13]

F. The Canadian Government Inquiry

On September 18, 2006, a Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar- (“Arar Commission”), established by the government of Canada to investigate the Arar affair, issued a three-volume report. See Arar Comm’n, Report of the Events Relating to Maher Arar (2006).[14] A press release issued by the Commission summarized: “On Maher Arar the Commissioner [Dennis O’Connor] comes to one important *200 conclusion: T am able to say categorically that there is no evidence to indicate that Mr. Arar has committed any offence or that his activities constitute a threat to the security of Canada.’ ” Press Release, Arar Comm’n, Arar Commission Releases Its Findings on the Handling of the Maher Arar Case 1 (Sept. 18, 2006) (boldface in original), available at http://www. ararcommission.ea/eng/ReleaseFinaLSept 18.pdf (last visited May 31, 2008). On January 26, 2007, the Office of the Prime Minister of Canada issued the following announcement:
Prime Minister Stephen Harper today released the letter of apology he has sent to Maher Arar and his family for any role Canadian officials may have played in what happened to Mr. Arar, Monia Mazigh and their family in 2002 and 2003.
“Although the events leading up to this terrible ordeal happened under the previous government, our Government will do everything in its power to ensure that the issues raised by Commissioner O’Connor are addressed,” said the Prime Minister. “I sincerely hope that these actions will help Mr. Arar and his family begin a new and hopeful chapter in their lives.”
Canada’s New Government has accepted all 23 recommendations made in Commissioner O’Connor’s first report, and has already begun acting upon them. The Government has sent letters to both the Syrian and the U.S. governments formally objecting to the treatment of Mr. Arar. Ministers Day and MacKay have also expressed Canada’s concerns on this important issue to their American counterparts. Finally, Canada has removed Mr. Arar from Canadian lookout lists, and requested that the United States amend its own records accordingly-
The Prime Minister also announced that Canada’s New Government has successfully completed the mediation process with Mr. Arar, fulfilling another one of Commissioner O’Connor’s recommendations. This settlement, mutually agreed upon by all parties, ensures that Mr. Arar and his family will obtain fair compensation, in the amount of $10.5 million, plus legal costs, for the ordeal they have suffered.
Press Release, Prime Minister Releases Letter of Apology to Maher Arar and His Family and Announces Completion of Mediation Process (Jan. 26, 2007), available at http://pm.gc.ca/eng/media. asp?id=1509 (last visited May 31, 2008); see also Margaret L. Satterthwaite, Rendered Meaningless: Extraordinary Rendition and the Rule of Law, 75 Geo. Wash. L.Rev. 1333, 1339-10 (2007).
III. PROCEDURAL HISTORY

A. The Complaint and the District Court’s Opinion

On January 22, 2004, Arar filed a complaint in the United States District Court for the Eastern District of New York. In addition to its factual allegations, his complaint asserts as “Claims for Relief’:
1. That defendants, in contravention of the Torture Victim Prevention Act of 1991 (“TVPA”), 28 U.S.C. § 1350 (note), acted in concert with Jordanian and Syrian officials, and under color of Syrian law, to conspire and/or aid and abet in violating his right to be free from torture (Count 1).
2. That defendants knowingly or recklessly subjected him to torture and coercive interrogation in Syria in violation of his Fifth Amendment right to substantive due process (Count 2).
3. That defendants knowingly or recklessly subjected him to arbitrary de *201 tention without trial in Syria in violation of his Fifth Amendment right to substantive due process (Count 3).
4. That defendants intentionally or recklessly subjected him to arbitrary detention and coercive and involuntary custodial interrogation in the United States, and interfered with his ability to obtain counsel or petition the courts for redress, in violation of his Fifth Amendment right to substantive due process (Count 4).
See Arar, 414 F.Supp.2d at 257-58.
The district court denied Arar’s claim for declaratory relief, dismissed Counts 1, 2, and 3 with prejudice, and dismissed Count 4 without prejudice and with leave to replead. Id. at 287-88. The district court decided that: 1) Arar lacks standing to bring a claim for declaratory relief; 2) Arar has no TVPA action since (a) in the court’s view, Congress provided no private right of action under the TVPA for non-citizens such as Arar, and (b) he cannot show that defendants were acting under “color of law, of any foreign nation,” id. at 287; 3) even though the Immigration and Nationality Act (“INA”) does not foreclose jurisdiction over Arar’s substantive due process claims, no cause of action under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), can be extended in light of “special factors counseling hesitation in the absence of affirmative action by Congress,” id. at 396, 91 S.Ct. 1999, namely the national security and foreign policy considerations at stake; and 4) prior cases holding that inadmissible aliens deserve little due process protection are inapplicable to Arar’s claim that he was deprived of due process during his period of domestic detention because Arar was not attempting to effect an entry into the United States, and therefore the circumstances and conditions of confinement to which Arar was subjected while in U.S. custody may potentially raise Bivens claims, but Arar was required to replead them without regard to any rendition claim and name those defendants that were personally involved in the alleged unconstitutional treatment. Arar, 414 F.Supp.2d at 287-88.
Arar declined the district court’s invitation to replead. Instead, he appeals from the judgment of the district court.

B. The Panel’s Majority Opinion

The panel affirms the judgment of the district court as explained by the majority opinion. The majority concludes that (1) the allegations set forth in Arar’s complaint are sufficient, at this early stage of the litigation, to establish personal jurisdiction over defendants not resident in New York, but (2) Arar has not established federal subject-matter jurisdiction over his claim for declaratory relief. Ante at 163-64, 192-93. It concludes further that (3) Arar’s allegations do not state a claim against the defendants for damages under the TVPA, and (4) we cannot provide Arar with a judicially created cause of action for damages under the Fifth Amendment, pursuant to the Bivens doctrine. Id. at 163-64, 192-93. Finally, having decided to dismiss the complaint on these grounds, the majority does not reach the question of whether the INA or the state-secrets privilege foreclose Arar’s pursuit of this litigation. Id. at 191-92.
I agree with the majority’s conclusions as to personal jurisdiction, Arar’s request for a declaratory judgment, and his claim under the TVPA. Unlike the majority, however, I conclude that Arar adequately pleads violations of his constitutional rights and is entitled to proceed with his claims for monetary damages under Bivens. Finally, as Arar and the defendants agree, *202 were the complaint reinstated and this matter remanded, as I think it should be, the district court could then consider the defendants’ assertion of the “state-secrets privilege”[15] in the first instance, and limit discovery as is necessary to meet legitimate national security and related concerns.
IV. ANALYSIS
This is not an immigration case. Contrary to the majority’s analysis, Arar’s allegations do not describe an action arising under or to be decided according to the immigration laws of the United States. Arar did not attempt to enter the United States in any but the most trivial sense; he sought only to transit through JFK Airport in order to travel from one foreign country to another. He was initially interrogated by FBI agents, not INS officials; they sought to learn not about the bona fides of his attempt to “enter” the United States, but about his alleged links to al Qaeda. The INS was not engaged in order to make a determination as to Arar’s immigration status. The agency’s principal involvement came after the FBI failed to obtain desired information from him, in order to facilitate his transfer to Syria so that he might be further held and questioned under torture.
This lawsuit is thus about the propriety and constitutionality of the manner in which United States law enforcement agents sought to obtain from Arar information about terrorism or terrorists which they thought — wrongly as it turned out— that he possessed. The majority goes astray when it accepts the defendants’ attempt to cast it as an immigration matter.[16]
In my view, the issues raised on this appeal, approached in light of the case Arar actually seeks to assert, are relatively straightforward:
1. What is the gravamen of Arar’s complaint?
2. Does it allege a deprivation of his right to substantive due process under the Fifth Amendment to the United States Constitution?
3. If so, is a Bivens action available as a vehicle by which he may seek redress for the violation?
4. And, if so, are the defendants entitled to qualified immunity?

A. The Gravamen of the Complaint

It is well-settled in this Circuit that “we may not affirm the dismissal of [a plaintiffs] complaint because [he has] proceeded under the wrong theory ‘so long as [he has] alleged facts sufficient to support a meritorious legal claim.’ ” Hack v. President & Fellows of Yale College, 237 F.3d 81, 89 (2d Cir.2000) (quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997)), cert. denied, 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). In considering an appeal such as this one from a district court’s grant of the defendants’ Rule 12(b)(6) motion to dismiss, “ ‘[fjactual allegations alone are what matter[ ].’ ” Northrop, 134 F.3d at 46 (quoting Albert v. Carovano, 851 F.2d 561, 571 n. 3 (2d Cir.1988) (en banc) (citing Newman v. Silver, 713 F.2d 14, 15 n. 1 (2d Cir.1983))).[17] We are, moreover, required to *203 read the factual allegations in a complaint “as a whole.” See Shapiro v. Cantor, 123 F.3d 717, 719 (2d Cir.1997); see also Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1252 n. 11 (11th Cir.2005) (per curiam), cert. denied, — U.S. -, 127 S.Ct. 596, 166 L.Ed.2d 431 (2006); Goldwasser v. Ameritech Corp., 222 F.3d 390, 401 (7th Cir.2000).
The allegations contained in Arar’s complaint include assertions, which must be treated as established facts for present purposes, that: 1) Arar was apprehended by government agents as he sought to change planes at JFK Airport; he was not seeking to enter the United States; 2) his detention, based on false information given by the government of Canada, was for the purpose of obtaining information from him about terrorism and his alleged links with terrorists and terrorist organizations; 3) he was interrogated harshly on that topic — mostly by FBI agents — for many hours over a period of two days; 4) during that period, he was held incommunicado and was mistreated by, among other things, being deprived of food and water for a substantial portion of his time in custody; 5) he was then taken from JFK Airport to the MDC in Brooklyn, where he continued to be held incommunicado and in solitary confinement for another three days; 6) while at the MDC, INS agents sought unsuccessfully to have him agree to be removed to Syria because they and other U.S. government agents intended that he would be questioned there along similar lines, but under torture; 7) thirteen days after Arar had been intercepted and incarcerated at the airport, defendants sent him against his will to Syria. The defendants intended that he be questioned in Syria under torture and while enduring brutal and inhumane conditions of captivity. This was, as alleged, all part of a single course of action, conceived of and executed by the defendants in the United States. Its purpose: to make Arar “talk.”
Not until deep in its opinion, though, does the majority come to address, the heart of the matter: Arar’s treatment by defendants while he was present in the United States. When it finally does, the opinion disposes of the issue by describing only some of the pleaded facts: “[WJhile in the United States,” it says, Arar “was subjected to ‘coercive and involuntary custodial interrogations ... conducted for excessively long periods of time and at odd hours of the day and night’ on three occasions over thirteen days; ‘deprived of sleep and food for extended periods of time’; and, thereafter, was ‘held in solitary confinement, chained and shackled, [and] subjected to [an] invasive strip-search[ ].’ ” Ante at 189. Having thus limited its consideration to only a portion of the acts Arar complains of, the majority blandly concludes: “These allegations, while describing what might perhaps constitute relatively harsh conditions of detention, do not amount to a claim of gross physical abuse” necessary to support a conclusion that his due process rights had been infringed. Id. at 189.
But the majority reaches its conclusion by eliding, among other things, the manner in which Arar was taken into custody and the manner in which defendants dis *204 posed of him when their efforts to obtain information from him here proved fruitless. Arar was, in effect, abducted while attempting to transit at JFK Airport. And when he failed to give defendants the information they were looking for, and he refused to be sent “voluntarily” to Syria, they forcibly sent him there to be detained and questioned under torture.
It is true that after setting forth his allegations of fact in detail in his complaint, Arar structures his “claims for relief’ to charge knowing or reckless subjection to torture, coercive interrogation, and arbitrary detention in Syria (counts two and three) separately from, among other things, arbitrary detention and coercive and involuntary custodial interrogation in the United States (count four). See Arar, 414 F.Supp.2d at 257-58. The pleading’s form may have contributed to the majority’s erroneous separation of the decision to send Arar to Syria to be interrogated under torture from his “domestic” physical mistreatment. But, as noted, “‘[flactual allegations alone are what matter[ ].’ ” Northrop, 134 F.3d at 46 (quoting Albert, 851 F.2d at 571 n. 3). The assessment of Arar’s alleged complaint must take into account the entire arc of factual allegations that Arar makes — his interception and arrest; his questioning, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment at JFK Airport in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C., and forced transfer to Syrian authorities for further detention and questioning under torture.

B. Arar’s Pleading of a Substantive Due Process Violation

Principles of substantive due process apply only to a narrow band of extreme misbehavior by government agents acting under color of law: mistreatment of a person that is “so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lombardi v. Whitman, 485 F.3d 73, 79 (2d Cir.2007) (citations and internal quotation marks omitted). When Arar’s complaint is read to include all of the actions allegedly taken by the defendants against him within this country, including the actions taken to send him to Syria with the intent that he be tortured there, it alleges conduct that easily exceeds the level of outrageousness needed to make out a due process claim. Indeed, although the “shocks the conscience” test is undeniably vague, see Estate of Smith v. Marasco, 430 F.3d 140, 156 (3d Cir.2005); Schaefer v. Goch, 153 F.3d 793, 798 (7th Cir.1998), “[n]o one doubts that under Supreme Court precedent, interrogation by torture” meets that test, Harbury v. Deutch, 233 F.3d 596, 602 (D.C.Cir.2000), rev’d on other grounds, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002);[18] see also Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (interrogation methods were “too close to the rack and the screw to permit of constitutional differentiation”); Palko v. Connecticut, 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (noting that the Due Process Clause must at least “give protection against torture, physical or mental”), overruled on other grounds by Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The defendants did not themselves torture *205 Arar; they “outsourced” it.[19] But I do not think that whether the defendants -violated Arar’s Fifth Amendment rights turns on whom they selected to do the torturing: themselves, a Syrian Intelligence officer, a warlord in Somalia, a drug cartel in Colombia, a military contractor in Baghdad or Boston, a Mafia family in New Jersey, or a Crip set in South Los Angeles.
We have held that under the state-created danger doctrine, “[wjhere a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages.” Lombardi, 485 F.3d at 80; see also, e.g., Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir.1993) (finding liability where the police allegedly gave the green light for skinheads to assault a group of flag-burners), overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); see also Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 79 (1st Cir.2005) (“[I]n scenarios in which government officials actively direct or assist private actors in causing harm to an individual ... the government officials and the private actor are essentially joint tortfeasors, and therefore, may incur shared constitutional responsibility.” (citations and internal quotation marks omitted)). We have also held that “when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. Under these limited circumstances, the state may owe the incarcerated person an affirmative duty to protect against harms to his liberties inflicted by third parties.” Matican v. City of New York, 524 F.3d 151, 155-56 (2d Cir.2008) (citations, internal quotation marks, and footnotes omitted). This “duty arises solely from the State’s affirmative act of restraining the individual’s freedom to act on his own behalf through incarceration, institutionalization, or other similar restraint of personal liberty.” Id.[20]
The majority reaches the wrong conclusion in large measure, I think, by treating Arar’s claims as though he were an unad-mitted alien seeking entry into the United States. The majority asserts that “[a]s an unadmitted alien, Arar as a matter of law lacked a physical presence in the United States.” Ante at 186. And it concludes from this that “the full protections of the due process clause” do not apply to Arar because they “apply only to ‘persons within the United States.’ ” Id. (quoting Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (internal quotation marks omitted)).
But the notion that, while in New York City, Arar was not “physically present” in the United States, is a legal fiction peculiar to immigration law. It is relevant only to the determination of an alien’s immigration *206 status and related matters. It is indeed a fiction that works largely to the benefit of aliens, permitting them to remain here while immigration officials determine whether they are legally admissible.
If Arar had been seeking to immigrate to the United States,[21] had he been detained at the immigration entry point at JFK Airport; had he thereafter been held at the MDC in Brooklyn pending deportation to his home in Canada, he presumably would have properly been treated, for immigration purposes, as though he had been held or turned back at the border. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (“Aliens seeking entry obviously can be turned back at the border without more.... [Temporary harborage, an act of legislative grace, bestows no additional rights.”); Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (concluding that an unadmitted alien held on Ellis Island, and later elsewhere within the United States, was “to be regarded as stopped at the boundary line” for naturalization purposes). But for purposes of assessing his treatment by law enforcement agents during his detention and interrogation in several places in the City of New York, it cannot follow from a legal fiction applicable to immigration status that Arar, rather like the fictional “little man who wasn’t there,”[22] was never in this country.[23] Arar sought not to enter this *207 country, but to leave it, after transiting briefly through one of its airports. For purposes of identifying the most rudimentary of his rights under the Constitution, the fiction that Arar was not here is senseless. He was here, as a matter of both fact and law, and was therefore entitled to protection against mistreatment under the Due Process Clause.
* * *
The majority acknowledges that even an unadmitted alien, treated under the immigration laws as though he was not physically present within the United States, has constitutional rights. The majority sees the scope of those rights as not extending “beyond” freedom from “gross physical abuse.” See ante at 190. I think that unduly narrow. It seems to me that Arar was entitled to the bare-minimum protection that substantive due process affords.
In support of applying a “gross physical abuse” standard, the majority cites Lynch v. Cannatella, 810 F.2d 1363, 1374 (5th Cir.1987), Correa v. Thornburgh, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990), and Adras v. Nelson, 917 F.2d 1552, 1559 (11th Cir.1990). These cases are highly doubtful authority for present purposes. Again, they are immigration cases. They deal with the treatment of aliens who, having sought admission to the United States, were awaiting removal or a determination of their status under the immigration laws. It is difficult to understand the relevance of those decisions to the rights of an alien who wished to transit through an American airport but was taken into custody for interrogation as to non-immigration matters instead.
Even accepting these cases as setting forth the applicable standard, however, I think Arar adequately alleges a violation of his substantive due process rights. His allegations, properly construed, describe decisions made and actions taken by defendants within the United States, while Arar was in the United States, designed to obtain information from him, even if doing so ultimately required his detention and torture abroad. Once the defendants, having despaired of acquiring the information from Arar here, physically caused him to be placed in the hands of someone, somewhere — anyone, anywhere — for the purpose of having him tortured, it seems to me that they were subjecting him to the most appalling kind of “gross physical abuse.”[24] They thereby violated his right to due process even as the majority artificially limits that right.
It may be worth noting, finally, that in order for one or more of the defendants to be liable for the infringement of Arar’s *208 substantive due process rights, that defendant or those defendants would presumably have to be found by the trier of fact to have participated in a broad enough swath of Arar’s mistreatment to be held responsible for the violation. A lone INS agent who asked Arar questions at JFK Airport on September 26, or the pilot of the airplane in which Arar was sent to Washington, D.C., en route to Jordan and Syria on October 8, would be unlikely to be liable to Arar for damages for their limited roles in the events. Who, if anyone, fits that description, however, seems to me a question that cannot be addressed at this time, without the fruits of pre-trial discovery.
C. Availability of a Bivens Action
In Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court “recognized for the first time an implied private right of action for damages against federal officers alleged to have violated a citizen’s constitutional rights.” Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).[25] The Bivens Court permitted “a victim of a Fourth Amendment violation by federal officers [to] bring suit for money damages against the officers in federal court.” Id.
I have no quarrel with much of what I take to be the majority’s view of Bivens jurisprudence. The Supreme Court has indeed been most reluctant to “extend” use of the “Bivens model.” Wilkie v. Robbins, — U.S. -, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007). Since Bivens, the Court has “extended” its reach only twice — to “recognize[ ] an implied damages remedy under the Due Process Clause of the Fifth Amendment, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).” Malesko, 534 U.S. at 67, 122 S.Ct. 515; see also Wilkie, 127 S.Ct. at 2597-98.
The majority is also correct in observing that when determining whether to extend Bivens, i.e., whether “to devise a new Bivens damages action,” Wilkie, 127 S.Ct. at 2597, a court must first determine whether Congress has provided “any alternative, existing process for protecting the interest” in question, id. at 2598. If no alternative remedial scheme exists, whether to provide “a Bivens remedy is a matter of judicial judgment.” Id. “ ‘[T]he federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.’ ” Id. (quoting Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)).
-But not every attempt to employ Bivens to redress asserted constitutional violations requires a separate and independent *209 judicial inquiry as to whether the remedy is appropriate in that particular case. Only when the court is being asked “to devise a new Bivens damages action,” id. at 2597 (emphasis added), do we make such an assessment. And a “new Bivens damages action” is not being sought unless the plaintiff is asking the court to “extend Bivens liability to a[ ] new context or new category of defendants.” Malesko, 534 U.S. at 68, 122 S.Ct. 515.
In the case before us, Arar seeks to add no new category of defendants. Cf. Malesko, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (refusing to extend Bivens to claims against private prisons); FDIC v. Meyer, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (refusing to extend Bivens to claims against federal agencies). Indeed, it was recovery of damages incurred as a result of the violation of constitutional rights by federal agents and officials, such as the defendants here, for which the Bivens remedy was devised. See Malesko, 534 U.S. at 70, 122 S.Ct. 515 (“The purpose of Bivens is to deter individual federal officers from committing constitutional violations.”).
We must ask, then, whether Arar seeks to extend Bivens liability into a new context and, if so, what that new context is. The task is complicated by the fact that the meaning that the Supreme Court ascribes to the term “new context” is not entirely clear. Compare Malesko, 534 U.S. at 67, 122 S.Ct. 515 (noting that Bivens was extended to a new context in Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), when the Court “recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment ” (emphasis added)), with id. at 68, 122 S.Ct. 515 (describing Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), in which the plaintiffs sought damages under the Due Process Clause of the Fifth Amendment for errors made by federal officials in “in the[] handling [their] of Social Security applications,” as describing a new context to which the Court declined to extend Bivens (emphasis added)). The majority seems to be of the view that “new context” means a new set of facts, rather than a new legal context. But every case we hear presents a new set of facts to which we are expected to apply established law. Yet, each panel of this Court does not decide for itself, on an ad hoc basis, whether or not it is a good idea to allow a plaintiff, on the particular factual circumstances presented, to avail him or herself of a well-established remedy such as that afforded by Bivens.[26] I therefore think that the word “context,” as employed for purposes of deciding whether we are “devisfing] a new Bivens damages action,” Wilkie, 127 S.Ct. at 2597, is best understood to mean legal context — in this case a substantive due process claim by a federal detainee — and not, as the majority would have it, the fact-specific “context” of Arar’s treatment, from his being taken into custody as a suspected member of al Qaeda to *210 his being sent to Syria to be questioned under torture.
As far as I can determine, this Circuit has never explicitly decided whether a Bivens action can lie for alleged violations of substantive due process under the Fifth Amendment. But our cases imply that such a remedy is appropriate.
In Iqbal, for example, we considered a Bivens action brought on, inter alia, a Fifth Amendment substantive due process theory. The plaintiff alleged his physical mistreatment and humiliation, as a Muslim prisoner, by federal prison officials, while he was detained at the MDC. After concluding, on interlocutory appeal, that the defendants were not entitled to qualified immunity, we returned the matter to the district court for further proceedings. We did not so much as hint either that a Bivens remedy was unavailable or that its availability would constitute an unwarranted extension of the Bivens doctrine.[27] Iqbal, 490 F.3d at 177-78.
In any event, I see no reason why Bivens should not be available to vindicate Fifth Amendment substantive due process rights. As Judge Posner wrote for the Seventh Circuit with respect to a Bivens action:
[I]f ever there were a strong case for “substantive due process,” it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody. If the wanton or malicious infliction of severe pain or suffering upon a person being arrested violates the Fourth Amendment — as no one doubts — and if the wanton or malicious infliction of severe pain or suffering upon a prison inmate violates the Eighth Amendment — as no one doubts — -it would be surprising if the wanton or malicious infliction of severe pain or suffering upon a person confined following his arrest but not yet charged or convicted were thought consistent with due process.
Wilkins v. May, 872 F.2d 190, 194 (7th Cir.1989), cert. denied, 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990);[28] accord Magluta v. Samples, 375 F.3d 1269 (11th Cir.2004) (reversing district court’s dismissal of pretrial detainee’s Bivens action alleging unconstitutional conditions of confinement at federal penitentiary in violation of the Due Process Clause of the Fifth Amendment); Cale v. Johnson, 861 F.2d 943, 946-47 (6th Cir.1988) (concluding *211 that “federal courts have the jurisdictional authority to entertain a Bivens action brought by a federal prisoner, alleging violations of his right to substantive due process”), abrogated on other grounds by Thaddeus-X v. Blatter, 175 F.3d 378, 387-88 (6th Cir.1999); see also Sell v. United States, 539 U.S. 166, 193, 123 S.Ct. 2174, 156 L.Ed.2d 197 (Scalia, J., dissenting) (observing, in dissent, that “a [Bivens] action ... is available to federal pretrial detainees challenging the conditions of their confinement”) (citing Lyons v. U.S. Marshals, 840 F.2d 202 (3d Cir.1988)).[29]
A federal inmate serving a prison sentence can employ Bivens to seek damages resulting from mistreatment by prison officials. Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). It would be odd if a federal detainee not charged with or convicted of any offense could not bring an analogous claim.[30]
* * *
Even if “new context” for Bivens purposes does mean a new set of facts, however, and even if Iqbal, despite its factual and legal similarities, does not foreclose the notion that the facts of this case are sufficiently new to present a “new context,” I think the majority’s conclusion is in error.
The majority, applying the first step of the Bivens inquiry, argues that the INA provided an alternative remedial scheme for Arar. Ante at 179-81. The district court correctly noted to the contrary that “Arar alleges that his final order of removal was issued moments before his removal to Syria, which suggests that it may have been unforeseeable or impossible to successfully seek a stay, preserving Arar’s procedural rights under the INA.” Arar, 414 F.Supp.2d at 280. Nonetheless, the majority ultimately finds that this claim of official interference does not exclude the INA as providing an alternative remedial scheme. It relies on Bishop v. Tice, 622 F.2d 349 (8th Cir.1980), which, it says, stands for the proposition that “federal officials who interfere[] with a plaintiffs access to an exclusive remedial scheme e[an], pursuant to Bivens, be held liable for that interference inasmuch as it violated due process, but c[an] not be sued for the underlying injury that the remedial scheme was designed to redress.” Ante at 180.
Arar is not, however, seeking relief for the underlying injury that the INA was designed to redress. As the majority recognizes, ante at 191, he is not challenging his removal order. Nor is he questioning this country’s ability, however it might limit itself under its immigration laws, to remove an alien under those laws to a country of its choosing. He is challenging the constitutionality of his treatment by defendant law-enforcement officers while he was *212 in detention in the United States.[31] For allegations of this sort, the INA offers no mechanism for redress. As the district court noted correctly:
[T]he INA deals overwhelmingly with the admission, exclusion and removal of aliens — almost all of whom seek to remain within this country until their claims are fairly resolved. That framework does not automatically lead to an adequate and meaningful remedy for the conduct alleged here.
Arar, 414 F.Supp.2d at 280.[32]
The majority also errs, I think, in concluding that “special factors” counsel against the application of Bivens here. Ante at 181-86. The majority dwells at length on the implications of Arar’s Bivens claim for diplomatic relations and foreign policy. See ante at 181-86.
Any legitimate interest that the United States has in shielding national security policy and foreign policy from intrusion by federal courts, however, would be protected by the proper invocation of the state-secrets privilege. The majority says that the “government’s assertion of the state-secrets privilege ... constitutes a ... special factor counseling this Court to hesitate before creating a new [Bivens action].” Ante at 183-85. But as the majority earlier acknowledges, “[o]nce properly invoked, the effect of the [state-secrets] privilege is to exclude [privileged] evidence from the case.” Ante at 167 n. 4 (citing Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir.1991)).
Moreover, the state-secrets privilege is a narrow device that must be specifically invoked by the United States and established by it on a case-by-case basis. See Zuckerbraun, 935 F.2d at 546 (“The privilege may be invoked only by the government and may be asserted even when the government is not a party to the case.”). That seems far preferable to the majority’s blunderbuss solution — to withhold categorically the availability of a Bivens cause of *213 action in all such cases — and the concomitant additional license it gives federal officials to violate constitutional rights with virtual impunity. Rather than counseling against applying Bivens, the availability to the defendants of the state-secrets privilege counsels permitting a Bivens action to go forward by ensuring that such proceedings will not endanger the kinds of interests that properly concern the majority.
The majority reaches its conclusion, moreover, on the basis of the proposition that “[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative ... Departments of the Government,” ante at 183-84 (citing First Nat’l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 766, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion)). But there is a long history of judicial review of Executive and Legislative decisions related to the conduct of foreign relations and national security. See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 536, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (“Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.”); Mitchell v. Forsyth, 472 U.S. 511, 523, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“[Djespite our recognition of the importance of [the Attorney General’s activities in the name of national security] to the safety of our Nation and its democratic system of government, we cannot accept the notion that restraints are completely unnecessary.”); Home Bldg. & Loan Ass’n v. Blaisdell, 290 U.S. 398, 426, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (“[E]ven the war power does not remove constitutional limitations safeguarding essential liberties.”). As the Supreme Court observed in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), “it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.” Id. at 211, 82 S.Ct. 691; see also Brief of Retired Federal Judges as Amici Curiae at 11 (“The Supreme Court has made clear that the Executive’s power to protect national security or conduct foreign affairs does not deprive the judiciary of its authority to act as a check against abuses of those powers that violate individual rights.”).
The alleged intentional acts which resulted in Arar’s eventual torture and inhumane captivity were taken by federal officials while the officials and Arar were within United States borders, and while Arar was in the custody of those federal officials.[33] He therefore presents this *214 Court with a classic, or at the very least viable, Bivens claim — a request for damages incurred as a result of violations of his Fifth Amendment substantive due process rights by federal officials while they detained him.

D. Qualified Immunity

Having thus found that Arar makes out an actionable claim under Bivens, we must analyze whether the defendants are entitled to qualified immunity. In Iqbal, we set forth the elements of qualified immunity review:
The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action — that is, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. A defendant will be entitled to qualified immunity if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violate clearly established law.
Iqbal, 490 F.3d at 152 (citations and internal quotation marks omitted). For the reasons set forth above, I have little doubt as to step one: The facts as alleged constitute a violation of Arar’s constitutional rights.
We must therefore ask whether these rights were clearly established at the time of their violation. In Iqbal, as already noted above, “[w]e ... reeognize[d] the gravity of the situation that confronted investigative officials of the United States as a consequence of the 9/11 attacks. We also recognize[d] that some forms of governmental action are permitted in emergency situations that would exceed constitutional limits in normal times.” Iqbal, 490 F.3d at 159. But we said that the right to substantive due process — including “the right not to be subjected to needlessly harsh conditions of confinement, the right to be free from the use of excessive force, and the right not to be subjected to ethnic or religious discrimination” — “do[es] not vary with surrounding circumstances.” Id. “The strength of our system of constitutional rights derives from the steadfast protection of those rights in both normal and unusual times.” Id. We said nothing to indicate that this notion was novel at the time of Iqbal’s alleged mistreatment; neither was it at the time of Arar’s some months later.
The question here is whether the treatment that Arar received at the hands of the defendants in order to coerce him to “talk” would be understood by a reasonable officer to be beyond the constitutional pale. We need not recite the facts as alleged yet again in order to conclude that they would have been. “No one doubts that under Supreme Court precedent, interrogation by torture like that alleged by [the plaintiff] shocks the conscience,” Harbury, 233 F.3d at 602, and would therefore constitute a violation of the plaintiffs Fifth Amendment right to substantive due process if perpetrated directly by the defendants, cf. Chavez v. Martinez, 538 U.S. 760, 773, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion) (stating that the Due Process Clause would “provide relief *215 in appropriate circumstances” for “police torture or other abuse”).
I think it would be no less “clear to a reasonable officer” that attempting, however unsuccessfully, to obtain information from Arar under abusive conditions of confinement and interrogation, and then outsourcing his further questioning under torture to the same end, is “unlawful.” The defendants here had “fair warning that their alleged treatment of [Arar] was unconstitutional.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). I would therefore conclude that they are not entitled to qualified immunity at this stage of the proceedings.
It may seem odd that after all the deliberation that has been expended in deciding this case at the trial and appellate levels, I can conclude that the constitutional violation is clear. But it is the availability of a Bivens action that has been the focus of controversy. Perhaps no federal agent could foretell that he or she would be subject to one. That, though, is not the question. The question is whether the unconstitutional nature of the conduct was clear. I think that it was.

E. Summary

In my view, then:
First, Arar’s factual allegations — beginning with his interception, detention, and FBI interrogation at JFK Airport, and continuing through his forced transportation to Syria in order that he be questioned under torture — must be considered in their entirety and as a whole.
Second, that conduct is “so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lombardi, 485 F.3d at 79 (citations and internal quotation marks omitted). Arar therefore alleges a violation of his right to substantive due process.
Third, he may seek to recover the damages allegedly thus incurred in a Bivens action.
Finally, although a reasonable government official may have wondered whether a Bivens action was available as a means for Arar to redress his rights allegedly infringed, insofar as any one of them was responsible for his treatment as a whole, he or she could not have reasonably thought that his or her behavior was constitutionally permissible and is therefore not entitled to qualified immunity, at least at this stage of the proceedings.
The defendants’ actions as alleged in the complaint, considered together, constitute a violation of Arar’s Fifth Amendment right to substantive due process committed by government agents acting in the United States under color of federal authority. Whether Arar can establish, even in the teeth of the state-secrets doctrine, properly applied, the truth of the allegations of his mistreatment (including causation and damages), should be tested in discovery proceedings, at the summary-judgment phase, and perhaps at trial.
V. CONCLUDING OBSERVATION
I have no reason whatever to doubt the seriousness of the challenge that terrorism poses to our safety and well-being. See generally, e.g., Philip Bobbitt, Terror and Consent: The Wars for the Twenty-First Century (2008). During another time of national challenge, however, Justice Jackson, joined by Justice Frankfurter, dissented from the Supreme Court’s decision that the due process rights of an unadmit-ted alien were not violated when he was kept indefinitely on Ellis Island without a hearing. See Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). The alien’s entry had been determined by the Attorney General to “be prejudicial to the public *216 interest for security reasons,” id. at 208, 73 S.Ct. 625, and he had therefore been excluded from the United States. Although Mezei was an immigration case with little bearing on the matter before us today, Justice Jackson’s observations then, at a time when we thought ourselves in imminent and mortal danger from international Communism, see, e.g., United States v. Dennis, 183 F.2d 201, 213 (2d Cir.1950) (L. Hand, J.), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), are worth repeating now:
The Communist conspiratorial technique of infiltration poses a problem which sorely tempts the Government to resort to confinement of suspects on secret information secretly judged. I have not been one to discount the Communist evil. But my apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else.
Shaughnessy, 345 U.S. at 227, 73 S.Ct. 625 (Jackson, J., dissenting).[34]
When it came to protection of the United States from then — perceived threats from abroad, Jackson was no absolutist. See American Communications Ass’n v. Douds, 339 U.S. 382, 422-52, 70 S.Ct. 674, 94 L.Ed. 925 (1950) (Jackson, J., concurring in part and dissenting in part) (addressing the threat of international Communism); Terminiello v. City of Chicago, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting) (warning that if “if the Court does not temper its doctrinaire logic [as to freedom of speech] with a little practical wisdom,” there is a danger that “it will convert the constitutional Bill of Rights into a suicide pact”). But with respect to the government’s treatment of Mr. Mezei, he concluded: “It is inconceivable to me that this measure of simple justice and fair dealing would menace the security of this country. No one can make me believe that we are that far gone.” Shaughnessy, 345 U.S. at 227, 73 S.Ct. 625 (Jackson, J., dissenting). I think Justice Jackson’s observations warrant careful consideration at the present time and under present circumstances.

.The Supreme Court granted certiorari in Iqbal to address (1) the requirements under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for stating an "individual-capacity claim[ ]” against a "cabinet-level officer or other high-ranking official,” and (2) the extent to which a “cabinet-level officer or other high-ranking official” can be held "personally liable for the allegedly unconstitutional acts of subordinate officials.” Ashcroft v. Iqbal, - U.S. -, 128 S.Ct. 2931, L.Ed.2d -, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015); see also Petition for a Writ of Certiorari, cert. granted sub nom. Ashcroft v. Iqbal, No. 07-1015 (U.S. June 16, 2008). These questions have no bearing on the propositions for which this dissent cites Iqbal.

. As a teenager, Arar had emigrated from Syria to Canada where he lived with his parents, and then his wife and children.

. For present purposes, on this appeal from a dismissal of the complaint under Fed.R.Civ.P. 12(b)(6), the facts are the factual allegations as pleaded in the complaint. See, e.g., Iqbal, 490 F.3d at 147. The fact that Arar did not choose to verify his complaint, see ante at 165-66, 171-72, is irrelevant. 5 Charles A. Wright & Arthur R. Miller, Federal Practice *194 and Procedure § 1339 (3d ed. 2004) ("Under Federal Rule 11, pleadings, motions, and other papers need not be verified or accompanied by an affidavit except when ‘specifically provided by rule or statute' ... [and] [a] party's verification of a pleading that need not have been verified does not give the pleading any added weight or importance in the eyes of the district court.”).

. On March 1, 2003, the INS was reconstituted as the Bureau of Immigration and Customs Enforcement and the Bureau of United States Citizenship and Immigration Services, both within the Department of Homeland Security. The actions at issue in this appeal were taken when the agency was still known as the INS.

. Citations to the district court opinion are in parentheses. The footnotes and subheadings are mine.

. Arar was employed by The MathWorks, Inc., a privately held, Massachusetts-based developer and supplier of software for technical computing. See Complaint, ¶ 12; About The MathWorks, http://www.mathworks.com/ company/aboutus/ (last visited May 31, 2008).

. That is, changes of plane.

. According to the complaint, on that day, Arar was questioned first by an FBI agent for five hours, Cplt. ¶ 29, then by an immigration officer for three hours, Cplt. ¶ 31.

. This is the same federal jail in which, less than a year earlier, Javaid Iqbal was allegedly mistreated. Iqbal, a Muslim inmate accused of violations of 18 U.S.C. §§ 371 and 1028 (conspiracy to defraud the United States and fraud with identification) and held post-9/11 in the MDC, allegedly suffered “unconstitutional actions against him in connection with his confinement under harsh conditions ... after separation from the general prison population.” Iqbal, 490 F.3d at 147, 148 n. 1. We held, with respect to Iqbal’s subsequent Bivens actions, that such treatment was not protected, as a matter of law, under the doctrine of qualified immunity. Id. at 177-78.

.Five days after Arar’s arrival in the United States.

. In New York City.

. Footnote in district court opinion, relating to the so-called "LaHood Letter” about a subsequent Canadian inquiry, omitted. See Arar, 414 F.Supp.2d at 256 n. 1.

. The district court’s description of the facts as alleged in the complaint ends here.

. On October 23, 2007, this Court granted Arar's motion to take judicial notice of the Report insofar as its existence and the scope of its contents were concerned, but denied the motion insofar as it may have sought judicial notice of the facts asserted in the report. But cf., ante at 162 (employing the report as the source for facts relating to Canadian involvement in the Arar incident).

. See United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir.1991).

. The district court, by contrast, did not treat this as an immigration case. See Arar, 414 F.Supp.2d at 285, 287.

, The Federal Rules of Civil Procedure tell us that "[pleadings must be construed so as *203 to do justice.” Fed.R.Civ.P. 8(e). Wright and Miller's treatise counsels that ”[t]his provision is not simply a precatory statement but reflects one of the basic philosophies of practice under the federal rules.” 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed.2004). “One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn.” Id.

. The Harbury court concluded, nonetheless, that because the murdered alien’s mistreatment occurred entirely abroad, he had not suffered a violation of his Fifth Amendment rights.. See Harbury, 233 F.3d at 603-04 (relying on United States v. Verdugo-Urquidez, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)).

. "[R]endition — the market approach — outsources our crimes, which puts us at the mercy of anyone who can expose us, makes us dependent on some of the world’s most unsavory actors, and abandons accountability. It is an approach we associate with crime families, not with great nations.” Philip Bobbitt, Terror and Consent: The Wars for the Twenty-First Century 388 (2008). "[OJne could get the worst of both worlds: national responsibility for acts as to which the agents we have empowered are unaccountable.” Id. at 387.

. Accordingly, Arar’s claim can be analyzed under either of the "two 'separate and distinct theories of liability’ under the substantive component of the Due Process Clause: ‘special relationship’ liability or 'state-created-danger’ liability.” Benzman v. Whitman, 523 F.3d 119, 127 (2d Cir.2008).

. While the majority opinion from time to time treats Arar as though he was an immigrant seeking entry into the United States, the INA makes a clear distinction between an immigrant seeking entry and an alien seeking only transit through the United States. The INA excludes from the definition of "immigrant” an alien "in immediate and continuous transit through the United States.” 8 U.S.C. § 1101(a)(15)(C). Moreover, at the time Arar flew to JFK Airport, the United States had in place a Transit Without Visa program that allowed an alien who would be required to obtain a visa to enter the United States to transit through a U.S. airport without obtaining a visa. As a citizen of Canada, a visa waiver country, Arar had no need to avail himself of this program. But its existence demonstrates the distinction, recognized by the government, between transit passengers, like Arar, and immigrants seeking entry into the United States. The program was suspended for security reasons on August 2, 2003, long after Arar's attempt to transit through JFK Airport. See Press Release, Department of Homeland Security, Homeland Security and Department of State Take Immediate Steps To Make Air Travel Even Safer (Aug. 2, 2003), available at http://www.dhs. gov/xnews/releases/pressreleases0227.shtm (last visited May 30, 2008).

. Hughes Mearns, Antigonish (1899).

. The Supreme Court’s decisions and our own invoke the entry fiction in cases related to the determination of an alien’s immigration status, and the procedural due process to which an alien is entitled by virtue of that status, not cases adjudicating alleged violations of an alien's substantive due process rights during detention. See, e.g., Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (concluding that temporary parole in United States while alien's admissibility was being determined did not entitle alien to benefit of statute giving Attorney General authority to withhold deportation of any alien "within the United States” if alien would thereby be subjected to physical persecution); Menon v. Esperdy, 413 F.2d 644, 647 (2d Cir.1969) (noting that “since a parole does not constitute an admission into the United States ... th[e] appeal involve[d] an exclusion ... rather than an expulsion”); Dong Wing Ott v. Shaughnessy, 247 F.2d 769, 770 (2d Cir.1957) (per curiam) (holding that the Attorney General’s "discretionary power to suspend deportation” did not apply to aliens "within the country on parole,” because parole, "by statute[, was] not [to] be regarded as an admission of the alien” (citation and internal quotation marks omitted)), cert. denied, 357 U.S. 925, 78 S.Ct. 1368, 2 L.Ed.2d 1370 (1958); Knauff v. Shaughnessy, 179 F.2d 628, 630 (2d Cir.1950) (per curiam) (alien stopped at the border and detained on Ellis Island "is not ‘in the United States’ ... [and therefore] is not entitled to naturalization”); see also Martinez-Aguero v. Gonzalez, 459 F.3d 618, 623 (5th Cir.) (rejecting appli *207 cation of the entry fiction to Bivens claims involving the use of excessive force), cert. denied, - U.S. -, 127 S.Ct. 837, 166 L.Ed.2d 667 (2006); Kwai Fun Wong v. United States, 373 F.3d 952, 973 (9th Cir.2004) ("The entry fiction is best seen ... as a fairly narrow doctrine that primarily determines the procedures that the executive branch must follow before turning an immigrant away.” (emphasis in original)).

. As the majority notes, Arar asserts that his substantive due process rights should be assessed under standards established for pretrial detainees in Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (deciding whether the challenged conditions amount to "punishment that may not constitutionally be inflicted upon [pretrial] detainees qua detainees”), Block v. Rutherford, 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), and Iqbal, 490 F.3d at 168-69. See ante at 189-90. I find such an analysis under these cases to be unhelpful. The issue here is not whether Arar was "punished” as a pre-trial detainee without first being tried and convicted. He was not a pre-trial detainee. The question is whether, as a person detained in the United States for interrogation, he may be mistreated and sent to be tortured in the way that he was.

. Bivens thus gave persons whose constitutional rights were violated by federal officers a remedy roughly akin to that available under 42 U.S.C. § 1983 to persons aggrieved by the acts of state officers. Unlike a Bivens action, the remedy provided by section 1983 is statutory in nature. But that statute was virtually a dead letter until it was given life by an interpretation of the Supreme Court some ninety years after it was enacted. See Monroe v. Pape, 365 U.S. 167, 171-72, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (concluding that what is now section 1983, derived from section 1 of the "Ku Klux Act” of 1871, provides for a cause of action against a state official acting under color of state law even if there is no authority under state law, custom, or usage for the state official to do what he or she did), overruled on other grounds by Monell v. Dep’t of Soc. Servs. of City of New York, 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. Indeed, in those legal contexts where Bivens is well-established, courts do not conduct a fresh assessment as to whether a Bivens action is available based on the facts of each case. See, e.g., Groh v. Ramirez, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Bivens action for Fourth Amendment violation); McCarthy v. Madigan, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (Bivens action for Eighth Amendment violation), superseded by statute on other grounds as stated in Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); Castro v. United States, 34 F.3d 106 (2d Cir.1994) (Fourth Amendment); Armstrong v. Sears, 33 F.3d 182 (2d Cir.1994) (same); Anderson v. Branen, 17 F.3d 552 (2d Cir.1994) (same); Hallock v. Bonner, 387 F.3d 147 (2d Cir.2004) (same), rev'd on other grounds, 546 U.S. 345, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006).

. Shortly after we decided Iqbal, the Supreme Court made clear that by appealing from the district court’s denial of qualified immunity, the defendants placed within our jurisdiction "the recognition of the entire cause of action." Wilkie, 127 S.Ct. at 2597 n. 4. The district court in Iqbal had specifically rejected the defendants' argument that a Bivens action was unavailable. Elmaghraby v. Ashcroft, No. 04 CV 01809, 2005 WL 2375202, at *14, 2005 U.S. Dist. LEXIS 21434, *44-*45 (E.D.N.Y. Sept. 27, 2005). Thus, had we thought that no Bivens action was available, we had the power to resolve Iqbal’s claims on that basis then. Wilkie, 127 5.Ct. at 2597 n. 4.
See also Thomas v. Ashcroft, 470 F.3d 491 (2d Cir.2006) (reversing district court’s dismissal of Bivens action for violation of plaintiff’s Fifth Amendment substantive due process rights while detained at the MDC); Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir. 2000) (dismissing, on qualified immunity grounds, plaintiff's substantive due process Bivens claim against federal prison officials, without questioning whether a cause of action was available); Li v. Canarozzi, 142 F.3d 83 (2d Cir. 1998) (affirming judgment following jury verdict for the defendants in substantive due process Bivens action based on allegations of abuse by a prison guard at the federal Metropolitan Correctional Center in New York City).

. Although there is some disagreement in the Circuits regarding precisely when, following arrest, abuse of detained persons is to be analyzed under principles of substantive due process, we think Wilkies’ comment as to why those principles must apply at some point is insightful and remains valid.

. While cases permitting pre-trial detainees to bring Bivens actions for violations of their substantive due process rights support the availability of a Bivens action here, Arar’s substantive due process claim should not be evaluated under the standard for assessing the claims of persons who, unlike Arar, were detained pre-trial rather than for the purpose of interrogation. See supra [note 24]. Cf. ante at 189-90 n. 29.

. We have not been asked by the parties to examine the possibility that Arar has pleaded facts sufficient to raise a claim under theories other than substantive due process-such as under the Fourth Amendment, the self-incrimination clause of the Fifth Amendment, or even the Eighth Amendment. Because this is an appeal from a dismissal on the facts pleaded in the complaint under Rule 12(b)(6), I think that even if this Court were to consider such an alternate theory and conclude that it was valid, the case would be subject to remand to the district court for further proceedings on that theory. See section IV.A, supra.

. Arar raises an actionable claim under Bivens for constitutional violations incurred at the hands of federal officials during his detention in the United States. The district court had jurisdiction over Arar's claims pursuant to 28 U.S.C. § 1331, and we have appellate jurisdiction under 28 U.S.C. § 1291. See Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); Macias v. Zenk, 495 F.3d 37, 40 (2d Cir.2007). Because Arar is not challenging his removal order, see ante at 191, the jurisdiction-stripping provision of the INA, 8 U.S.C. § 1252(a)(2)(B)(ii) (providing that "no court shall have jurisdiction to review ... any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified ... to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum]”) does not apply.

. The majority says that its holding is limited to the conclusion that, "barring further guid-anee from the Supreme Court ... a Bivens remedy is unavailable for claims 'arising from any action taken or proceeding brought to remove an alien from the United States under’ the authority conferred upon the Attorney General and his delegates by the INA.” Ante at 184 (quoting 8 U.S.C. § 1252(b)(9)). But this is not an immigration case and it seems to me that "the authority conferred upon the Attorney General and his delegates by the INA” is therefore not relevant to the Bivens question presented. The majority offers no view as to whether a substantive due process Bivens action is available to detained persons generally. I cannot ultimately tell, then, what the majority’s view would be as to Arar’s ability to avail himself of Bivens if we were to treat this case, as I think we must, as a claim that law enforcement officials abused their authority under color of federal law rather than a case arising under and governed by immigration law.

. Irrespective of what ultimately happened to Arar abroad, the actions that he challenges were perpetrated by U.S. agents entirely within the United States. This case is thus decisively different from United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), where the allegedly unconstitutional conduct, an illegal search and seizure, took place in Mexico. It is similarly different from Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), which held that "(a) ... an enemy alien; (b) [who] has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and [wa]s at all times imprisoned outside the United States” did not have a right to seek a writ of habeas corpus from the courts of the United States on the grounds that, inter alia, his Fifth Amendment rights had been violated. Id. at 777, 70 S.Ct. 936. Eisentrager remains good law for the proposition that there is "no authority ... for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever *214 they are located and whatever their offenses,” id. at 783, 70 S.Ct. 936. But that proposition is not inconsistent with any principle that Arar asserts or that this dissent embraces or applies.

. The Supreme Court very recently observed:
Security depends upon a sophisticated intelligence apparatus and the ability of our Armed Forces to act and to interdict. There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint....
Boumediene v. Bush, -U.S.-, 128 S.Ct. 2229, 2277,-L.Ed.2d-- (2008).